**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| MICHAEL S. GOLDBERG, LLC | ) Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG | )          09-23371 (ASD) |
| | ) |
| | ) Jointly Administered Under |
| Debtors. | ) Case No. 09-23370 |
| | ) |
| | ) |
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE ESTATES OF | ) |
| MICHAEL S. GOLDBERG, LLC, and MICHAEL S. GOLDBERG | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| | ) |
| AUG LLC; AUG II, LLC; AUG PARTNERS, LLC; NANCY ADELIS; | ) |
| THOMAS ALMY; BAYSTATE CAPITAL, LLC; GAYLE BROWN; PETER | ) |
| P. CARBONE, as Trustee of PETER P. CARBONE TRUST; EDWARD B. | ) |
| CAUDILL; JEFFREY CHIZMAS; STUART J. COHEN, Individually, and as | ) |
| Beneficiary of STUART COHEN IRA; DIXIE PLUMBING SERVICE, INC.; | ) |
| B. JAMES DOERKSEN; KIRK ELYAKIN; MARILYN ELYAKIN; BRUCE | ) |
| J. ETKIN as Trustee of BRUCE J. ETKIN REVOCABLE LIVING TRUST; | ) |
| ROBERT H. FIER; FINANCIAL SECURITY SERVICES DEFINED | ) |
| BENEFIT PLAN FOR THE BENEFIT OF JAY MARMER; FINANCIAL | ) |
| SECURITY SERVICES DEFINED BENEFIT PLAN FOR THE BENEFIT OF | ) |
| STEVEN E. MARCUS; FINANCIAL SECURITY SERVICES DEFINED | ) |
| BENEFIT PLAN; FINANCIAL SECURITY SERVICES, LLC; BARRY | ) |
| GORSUN; MATTHEW GREER; DEBORAH YALOWITZ HAILE; | ) |
| HOWARD McDONALD HAILE; HALEY FAMILY LIMITED | ) |
| PARTNERSHIP; EDWARD HARWOOD; DEBRA HOFFMAN, as Trustee of | ) |
| HOFFMAN FAMILY TRUST; HYATT FAMILY LIMITED | ) |
| PARTNERSHIP; GILBERT E. HYATT, III, as General Partner of HYATT | ) |
| FAMILY LIMITED PARTNERSHIP, and as General Partner of HALEY | ) |
| FAMILY LIMITED PARTNERSHIP; GILBERT E. HYATT, IV; PATTI R. | ) |
| HYATT, as General Partner of HYATT FAMILY LIMITED PARTNERSHIP, | ) |
| and as General Partner of HALEY FAMILY LIMITED PARTNERSHIP; | ) |
| ROBERT JEROME; JILL S. KADINGO; RICHARD M. KADINGO; | ) |
| ROBERT KLEIN; JESS KRAVITZ; JASON LIEBLICH; MARCUS FAMILY | ) |
| PARTNERSHIP; STEVEN E. MARCUS, as General Partner of MARCUS | ) |

1

FAMILY PARTNERSHIP; JAY MARMER, Individually, and as Trustee of    )
MARMER FAMILY TRUST, and as Trustee of FINANCIAL SECURITY         )
SERVICES DEFINED BENEFIT PLAN, and as Trustee of FINANCIAL        )
SECURITY SERVICES DEFINED BENEFIT PLAN FOR THE BENEFIT OF         )
JAY MARMER, and as Trustee of FINANCIAL SECURITY SERVICES        )
DEFINED BENEFIT PLAN FOR THE BENEFIT OF STEVEN E. MARCUS;         )
JEREMY MARMER; JOSHUA MARMER; MARK MARMER; SHIRLEY               )
MARMER; STEFANI J. MARMER, Individually, and as Trustee of        )
MARMER FAMILY TRUST; TOVAH MARMER, MORGAN STANLEY &              )
CO., INCORPORATED, as Custodian of STUART COHEN IRA; MARK        )
MOSKOWITZ, as Trustee of CAT'S PAW TRUST; ELLIOT D. POLLACK,     )
as Beneficiary, Administrator, Manager or Trustee of PROPERTY    )
ADMINISTRATION SPECIALISTS INC. 401(k) PLAN FOR THE BENEFIT      )
OF ELLIOT D. POLLACK; PROPERTY ADMINISTRATION                    )
SPECIALISTS 401(K) PLAN FOR THE BENEFIT OF MR. ELLIOT D.         )
POLLACK; SIDNEY RICHMAN; N. LOUIS SHIPLEY; GARY SLAYTON;         )
LEWIS SLAYTON;  ELAINE STEIN, Individually, and as Successor Trustee  )
of PAUL SLAYTON TRUST AGREEMENT DATED FEBRUARY 19, 2002,        )
and as Trustee of the ELAINE STEIN 1992 REVOCABLE TRUST;         )
JEFFREY STEIN; MICHAEL STEIN; ROBERT STEIN, individually, and as  )
Trustee of the ROBERT STEIN 1992 REVOCABLE TRUST; STRATEGEM      )
ASSOCIATES, INC.; THOMAS J. RYAN INVESTMENT BROKERS INC.;        )
JEFFREY WEBSTER; CHARLES WEEDER                                   )
                                                                  )
                                                                  )
                                                                  )

        Defendants.

## COMPLAINT

      Plaintiff, James Berman, Chapter 7 Trustee (the "Trustee") for debtors Michael S.

Goldberg, LLC, d/b/a/ Acquisitions Unlimited Group (the "Debtor, LLC") and

Michael S. Goldberg ("Goldberg"), which are sometimes, collectively, referred to

hereinafter as  the "Debtor" or "Debtors", alleges as follows:

## SUMMARY OF THIS PROCEEDING

      This action seeks to recover approximately $11.8 million of preferentially and

fraudulently transferred cash to the defendants on the eve of the collapse of the Goldberg

Scheme (as hereinafter defined).  The Debtor's $10 million transfer to the defendants in late August 2009 was funded with cash fraudulently obtained from other investors in the Goldberg Scheme at a time when all the defendants actually or constructively knew that Goldberg was operating a fraudulent enterprise and/or Ponzi scheme.  The Trustee seeks to recover these payments of capital, "profit" and brokerage fees and commissions from the defendants who were all either members, managers or brokers of one of the largest "Feeders" in the Goldberg Scheme.

Defendant Robert Stein and his attorney Carl Santangelo set up a series of single purpose LLCs (the "AUG LLCs") and then, with the help of brokers Jay Marmer, Thomas J.  Ryan and Stuart Cohen, solicited wealthy individuals living primarily in South Florida to invest in the Goldberg Scheme by promising these investors an eye popping 30% annualized rate of return with virtually no risk to their capital.  The AUG LLCs were created by Robert Stein and Attorney Santangelo for the sole purpose of investing in the Goldberg Scheme.  Not surprisingly, these LLCs were named similarly to the Debtor LLC's d/b/a, "Acquisitions Unlimited Group", underscoring their function as pure investment vehicles for the Goldberg Scheme.  All of the defendants knew their investments were going into the Goldberg Scheme and, in fact, they contractually prohibited Mr. Stein from investing their money anywhere else.

Defendants Robert Stein, Jay Marmer and many other defendants had invested with Goldberg, both personally and through Mr. Stein's limited partnership, R. Stein &

Co., L.P. ("Stein, L.P."), in various deals since 2007. Even before establishing the AUG

LLCs, Robert Stein was suspicious of Goldberg's honesty and the legitimacy of his deals.

These previous deals with Goldberg (individually and through Stein, L.P.) included the

"Diamond Deals" (as defined in Paragraph 3) which had yielded returns as high as 120%

per annum, and the "Chase Asset Deals"(as defined in paragraph 4), which had yielded

returns of up to 100% per annum.

Notwithstanding his grave concerns about Goldberg, Robert Stein was so

motivated by greed that he continued to invest and to bring other investors to the table.

Instead of conducting sufficient and effective due diligence calculated to conclusively

determine whether or not Goldberg's business was legitimate, he created cash flow

safeguards to protect against  his and others' increasing concern that Goldberg was a

crook.

Robert Stein, Attorney Santangelo and their brokers were also well aware that

their potential investors would have the same obvious concerns. Consequently, they

decided to handle the "too good to be true" obstacle by convincing people to invest in the

Goldberg Scheme through their offering materials, solicitation letters and cash flow

structure of the AUG LLCs' deals with Goldberg. Their strategy was to entice investors

and allay their concerns about Goldberg not by proving his legitimacy, but rather by

assuring them that all investments in the Goldberg Scheme through the AUG LLCs

would be isolated and protected by a series of escrow accounts and other mechanisms so that neither Goldberg nor Robert Stein himself could touch any investor's cash.

Nevertheless, by July 9, 2009 Robert Stein and Attorney Santangelo were confronted with overwhelming evidence that the Goldberg Scheme was not only fraudulent but also clearly a Ponzi scheme. They then scrambled to get their latest investment capital and "profits" out before the Goldberg Scheme collapsed. They accomplished this by taking financial pressure off Goldberg and by enticing him with the false promise of a large future investment from a new source, contingent upon all the defendants' being repaid. As a result of these machinations, which coincided and may have precipitated the beginning of the end of the Goldberg Scheme, in late August and early September, 2009, Goldberg made the final $10 million of payments to Attorney Santangelo's trust account for the benefit of all the defendants using funds that Goldberg had stolen from other investors. Attorney Santangelo then forwarded not only the "profits" and "fees," but also the original capital investment back to all the defendants in an unusual, unprecedented and unilateral action that contradicted their normal course of conduct and the terms of the AUG LLCs' operating agreements. These actions were taken on behalf of all the defendants because, among other things, Robert Stein and Attorney Santangelo wanted to protect the defendants' cash and could not re-invest their money in a known Ponzi Scheme.

## FACTUAL BACKGROUND OF THE GOLDBERG SCHEME

1.      The $11.8 million of preferential and fraudulent transfers to the defendants the Trustee seeks to recover in this action were transferred to them in furtherance of a classic and pure Ponzi Scheme (the "Goldberg Scheme") [1] which was conducted over the last 12 years by Goldberg and the Debtor, LLC.

2.      The Goldberg Scheme promised (and, for a long time, paid) patently unbelievable rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter (when compounded over 100% annually), in purportedly *risk-free* investments.

3.      Goldberg represented to investors that he and/or the Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Goldberg

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. See Bear Stearns Servs. Corp. v. Gredd., 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also In re: Unified Commercial Capital Inc. 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., 387 B,R. at 8-10. See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS 28075*63 (S.D.N.Y. 2010).

represented that he could purchase diamonds at extremely low wholesale prices on the New York City diamond exchange and resell those diamonds for a profit sufficient to pay investors in these diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Deals"). The Diamond Deals also purported to grant investors a security interest in the diamonds supposedly purchased for re-sale.

4.     The second and more recent set of deals involved significantly more investor funds and were based on Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of "Chase Manhattan Bank" which tellingly has been publicly known as JP Morgan Chase, N.A. ("Chase") since 2000. Goldberg represented that he had a contractual right to purchase foreclosed business assets (such as structural steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals"). Goldberg told investors that his relationship with Chase was governed by a 1999 contract between the Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

5.     Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as United Technologies Corporation ("UTC"), Bechtel Corporation, Bausch and Lomb, Swinerton Builders and others.

6.     Goldberg also represented to investors that the Chase Asset Deals were "risk-free" because the purported Chase Master Agreement contained a "Contract Dissolution Capital Protection Clause" which obligated Chase to repurchase the foreclosed business assets for the full amount of the purchase price if the Debtor was unable to re-sell the acquired assets to the expected ultimate buyer.

7.     In stark contrast to the more complex fraudulent schemes utilized in the recent wave of high-profile Ponzi schemes such as those perpetrated by Bernard Madoff, Scott Rothstein, Mark Dreier and the Bayou Fund, the Goldberg Scheme did not involve any legitimate, or actual business or investment activity by the Debtors. All the funds used to pay investors came from other investors.

8.     There was no reasonable basis for investors, including the defendants, to believe Goldberg's returns were legitimate or his representations were truthful. First and foremost, the returns, themselves, on a risk-free basis, were patently incredible. In addition, Goldberg had never been a licensed investment advisor, had no financial training and was employed, on a full-time basis, as a medical device sales representative. Moreover, the documents utilized by Goldberg in his "deals" are replete with typos, ambiguous language, erroneous information and other "red flags" that should have put even the most unsophisticated investor on notice that they were dealing with a con artist. The fact that Goldberg appeared to be able to generate a seemingly limitless number of Diamond Deals **and** Chase Asset Deals (deals that strain credulity in isolation and which

taken together appear totally ludicrous) also should have alerted the defendants to the fraudulent nature of the Goldberg Scheme.

9.    The Debtors' Diamond Deals and Chase Asset Deals were a complete sham. The Debtors never bought diamonds or foreclosed assets with investor funds and never sold anything to the purported third-party "buyers." No "profits" or other income or proceeds were generated by any transactions involving the Debtors. All of the funds received by investors went to either pay off other investors or for Goldberg's personal use or benefit.

10.    As word of these fantastic returns on virtually risk-free investments spread, increasing numbers of investors wanted "in" on the Goldberg Scheme. More significantly, the Debtors, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme in return for a percentage of the investment dollars they generated ("Feeders").

11.    The increased investment activity in the Goldberg Scheme (between the early 2000s and 2007) was due, in part, to the Feeders' strong incentive to bring larger and larger deals to Goldberg. The Feeders were risking other people's money while "earning" a 2% to 5% participation rate *plus*, in some instances, a finder's fee of up to ten percent (10%) on the investments made by their clients. The increased investments generated by the Feeders caused the size of the Goldberg Scheme to explode between

2007 and 2009 to involve over a hundred and thirty million dollars in transactions and resulted over a hundred investors holding the bag for tens of millions of dollars in losses.

12.    In mid to late 2009, more and more large investors began demanding full payment on the due dates of their contracts, instead of "rolling them over." At this point, the Goldberg Scheme became increasingly difficult to maintain. Goldberg began making later and later payments while he tried to find replacement investors to pay off those investors who were demanding money. These late payments created additional concerns among large investors who, for all the reasons stated above, feared the worst in terms of Goldberg's <u>bona fides</u>. Accordingly, these large investors put Goldberg under increasing pressure.

13.    Shortly after the Debtor's $10 million payments to the defendants in August and September 2009, Goldberg was sued and his assets were frozen by a group of large investors whose recently invested millions had not been returned when due. At this point, Goldberg turned himself in to federal authorities.

14.    On or about November 16, 2009, Goldberg admitted to federal law enforcement officials that his sole source of payment to investors was with the funds obtained from other investors. On September 13, 2010, Goldberg entered a plea of guilty to federal wire fraud charges in connection with his operation of the Goldberg Scheme pursuant to the Plea Agreement attached hereto as **Exhibit A**. In the Plea Agreement, Goldberg admitted:

> **In fact, and as the defendant well knew, each and every
> one of the defendant's representations were false: aside
> from during the first six months of his scheme, the
> defendant did not purchase diamonds in New York City
> or any other location; the defendant did not have any
> relationship, contractual or otherwise, with Chase; the
> defendant did not purchase any foreclosed and seized
> assets from Chase, nor did he resell any foreclosed and
> seized assets.  In truth and in fact, the defendant paid
> the promised returns to existing investors with funds he
> received from new investors or reinvested funds.**

(Emphasis added.)

### Jurisdiction, Venue and Nature of this Proceeding

15.     On November 18, 2009 (the "Petition Date"), certain petitioning creditors

filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against

the Debtors.

16.     On November 24, 2009, the Court entered the Order for Relief in the

Debtors' cases.

17.     By Orders dated January 11, 2010, the Court confirmed the election of James

Berman as Chapter 7 Trustee in both cases.

18.     On February 26, 2010, this Court entered an order consolidating these cases

for joint administration only.

19.     This Complaint initiates an adversary proceeding pursuant to §§ 541, 544,

546, 547, 548, 550 and 551 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-

1330 ("Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 7001(1).  This

Complaint seeks (1) to avoid and recover for the benefit of the estates preferential transfers of the Debtors' property made to or for the benefit of the defendants on or within 90 days of the Petition Date; (2) to avoid and recover fraudulent transfers of the Debtors' property made to or for the benefit of the defendants; (3) the return of improper distributions to the members and managers of the AUG LLCs; (4) to avoid and recover intentional fraudulent transfers made by the AUG LLCs and AUG Partners to the defendants; and (5) to recover from the defendants the amounts by which they were unjustly enriched through the Goldberg Scheme.

20.     This Court has jurisdiction, under 28 U.S.C. §§ 157 and 1334(b), of the subject matter of this proceeding because the claims asserted herein arise under Chapter 7 of the Bankruptcy Code and are related to a case pending under the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").

21.     This  matter  is  a  core  proceeding  pursuant  to  28  U.S.C. §§ 157(b)(2)(A),(B),(E), (F), (H) and (O).

22.     Venue of this adversary proceeding in the Bankruptcy Court is proper pursuant to 28 U.S.C. § 1409(a) because the Debtors' cases are pending in this district and division.

## Parties

23.     The Trustee is the duly appointed Chapter 7 Trustee for the Debtors and has standing both as Trustee and as assignee of certain creditors to bring the causes of action asserted herein.

24.     Defendant, AUG, LLC ("AUG"), is a Florida limited liability company with its principal place of business in Singer Island, Florida.

25.     Defendant, AUG II, LLC ("AUG ll") is a Florida limited liability company with its principal place of business in Singer Island, Florida.

26.     Defendant, AUG Partners, LLC ("AUG Partners"), is a Florida limited liability company with its principal place of business in Singer Island, Florida.

27.     Defendant, Nancy Adelis, is an individual who is domiciled in Southport, North Carolina.

28.     Defendant, Thomas Almy, is an individual who is domiciled in Big Canoe, Georgia.

29.     Defendant, Baystate Capital, LLC ("Baystate"), is a Florida limited liability company with its principal place of business in Singer Island, Florida.

30.     Defendant, Gayle Brown, is an individual who is domiciled in Hingham, Massachusetts.

31.     Defendant, Peter P. Carbone, Trustee of the Peter P. Carbone Trust, a Florida trust, is domiciled in Singer Island, Florida.

32.     Defendant, Edward Caudill, is an individual who is domiciled in Gig Harbor, Washington.

33.     Defendant, Jeffrey Chizmas, is an individual who is domiciled in Saugus, Massachusetts.

34.     Defendant, Stuart Cohen, is an individual who is domiciled in Andover, Massachusetts.

35.     Defendant, Stuart Cohen, as beneficiary of the Stuart Cohen IRA, is domiciled in Andover, Massachusetts.

36.     Defendant, Dixie Plumbing Service, Inc. ("Dixie Plumbing"), is a Florida corporation with its principal place of business in Pompano Beach, Florida.

37.     Defendant, B. James Doerksen, is an individual who is domiciled in Gig Harbor, Washington.

38.     Defendant, Kirk Elyakin, is an individual who is domiciled in Monroe, New Jersey.

39.     Defendant, Marilyn Elyakin, is an individual who is domiciled in Monroe, New Jersey.

40.     Defendant, Bruce J. Etkin, Trustee of the Bruce J. Etkin Revocable Living Trust, an Arizona trust, is domiciled in Scottsdale, Arizona.

41.     Defendant, Robert H. Fier, is an individual who is domiciled in Stuart, Florida.

42.     Defendant, Financial Security Services Defined Benefit Plan for the benefit of Jay Marmer ("FSS Defined Benefit – Marmer"), is a defined benefit plan for a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida.

43.     Defendant, Financial Security Services Defined Benefit Plan for the benefit of Steven E. Marcus ("FSS Defined Benefit - Marcus"), is a defined benefit plan for a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida.

44.     Defendant, Financial Security Services Defined Benefit Plan ("FSS Defined Benefit") is a defined benefit plan for a limited liability company organized under the laws of the State of Florida with its principal place of business in Palm Beach Gardens, Florida.

45.     Defendant, Financial Security Services, LLC ("FSS"), is a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida.

46.     Defendant, Barry Gorsun, is an individual who is domiciled in Mason, Ohio.

47.     Defendant, Matthew Greer, is an individual who is domiciled in Miami, Florida.

48.     Defendant, Deborah Yalowitz Haile, is an individual who is domiciled in Dallas, Texas.

49.    Defendant, Howard McDonald Haile, is an individual who is domiciled in Dallas, Texas.

50.    Defendant, Haley Family Limited Partnership, is a Florida limited partnership with its principal place of business in Pompano Beach, Florida.

51.    Defendant, Edward Harwood, is an individual who is domiciled in Fort Lauderdale, Florida.

52.    Upon information and belief, Defendant, Debra Hoffman, Trustee of the Hoffman Family Trust, a Florida trust, is domiciled in Bridgewater, New Jersey.[2]

53.    Defendant, Hyatt Family Limited Partnership, is a Florida limited partnership with its principal place of business in Pompano Beach, Florida.

54.    Defendant, Gilbert E. Hyatt, III, General Partner of the Hyatt Family Limited Partnership, a Florida Limited Partnership, is domiciled in Pompano Beach, Florida.

55.    Defendant, Gilbert E. Hyatt, III, General Partner of the Haley Family Limited Partnership, a Florida Limited Partnership, is domiciled in Pompano Beach, Florida.

---

[2]  Upon information and belief, Leon Hoffman, who died on or about January 8, 2010, was the initial transferee of funds from the Goldberg Scheme.  On or before his death, Leon Hoffman transferred all or substantially all of his property to the Hoffman Family Trust, for which Debra Hoffman is the Trustee.  Because there were no assets in Leon Hoffman's estate after his death, the Palm Beach County Probate Court did not appoint a Personal Representative to administer his estate.

56.     Defendant, Gilbert E. Hyatt, IV, is an individual who is domiciled in Pompano Beach, Florida.

57.     Defendant, Patti R. Hyatt, General Partner of the Hyatt Family Limited Partnership, a Florida Limited Partnership, is domiciled in Pompano Beach, Florida.

58.     Defendant, Patti R. Hyatt, General Partner of the Haley Family Limited Partnership, a Florida Limited Partnership, is domiciled in Pompano Beach, Florida.

59.     Defendant, Robert Jerome, is an individual who is domiciled in Southport, North Carolina.

60.     Defendant, Jill S. Kadingo, is an individual who is domiciled in Jupiter, Florida.

61.     Defendant, Richard M. Kadingo, is an individual who is domiciled in Jupiter, Florida.

62.     Defendant, Robert Klein, is an individual who is domiciled in Willsboro, New York.

63.     Defendant, Jess Kravitz, is an individual who is domiciled in Scottsdale, Arizona.

64.     Defendant, Jason Lieblich, is an individual who is domiciled in Lincoln, Massachusetts.

65.     Defendant, The Marcus Family Partnership, upon information and belief, is a Florida partnership.

66.    Defendant Steven E. Marcus, General Partner of the Marcus Family Partnership, is domiciled in West Palm Beach, Florida.

67.    Defendant, Jay Marmer, is an individual who is domiciled in Palm Beach Gardens, Florida.

68.    Defendant, Jay Marmer, Trustee of the Marmer Family Trust, a Florida trust, is domiciled in Palm Beach, Florida.

69.    Defendant Jay Marmer, Trustee of Financial Security Services Defined Benefit Plan, a defined benefit plan for a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida, is domiciled in Palm Beach Gardens, Florida.

70.    Defendant Jay Marmer, Trustee of Financial Security Services Defined Benefit Plan For the Benefit of Jay Marmer, a defined benefit plan for a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida, is domiciled in Palm Beach Gardens, Florida.

71.    Defendant Jay Marmer, Trustee of Financial Security Services Defined Benefit Plan For the Benefit of Steven E. Marcus, a defined benefit plan for a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida, is domiciled in Palm Beach Gardens, Florida.

72.    Defendant, Jeremy Marmer, is an individual who is domiciled in Palatine, Illinois.

73.     Defendant, Joshua Marmer, is an individual who is domiciled in New York, New York.

74.     Defendant, Mark Marmer, is an individual who is domiciled in New York, New York.

75.     Defendant, Shirley Marmer, is an individual who is domiciled in Boynton Beach, Florida.

76.     Defendant, Stefani Marmer, is an individual who is domiciled in Palm Beach Gardens, Florida.

77.     Defendant, Stefani Marmer, as Trustee of the Marmer Family Trust, a Florida trust, is domiciled in Palm Beach, Florida.

78.     Defendant, Tovah Marmer, is an individual who is domiciled in New York, New York.

79.     Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley"), Custodian of the Stuart Cohen IRA, is a Delaware Corporation with its principal place of business in New York, New York.

80.     Defendant, Mark Moskowitz, Trustee of The Cat's Paw Trust, an Arizona trust, is domiciled in Paradise Valley, Arizona.

81.     Defendant, Elliot D. Pollack, as Beneficiary, Administrator, Manager or Trustee of the Property Administration Specialists 401(k) Plan for the benefit of Mr. Elliott D. Pollack, is domiciled in Scottsdale, Arizona.

82.    Upon information and belief, Defendant, Property Administration Specialists 401(k) Plan for the benefit of Mr. Elliott D. Pollack, is a 401(k) Plan organized by Property Administration Specialists, Inc., an Arizona corporation with its principal place of business in Scottsdale, Arizona.

83.    Defendant, Sidney Richman, is an individual who is domiciled in Palm Beach Gardens, Florida.

84.    Defendant, N. Louis Shipley, is an individual who is domiciled in Andover, Massachusetts.

85.    Defendant, Gary Slayton, is an individual who is domiciled in Chicopee, Massachusetts.

86.    Defendant, Lewis Slayton, is an individual who is domiciled in Stamford, Connecticut.

87.    Defendant, Elaine Stein, is an individual who is domiciled in Singer Island, Florida.

88.    Defendant, Elaine Stein, successor Trustee of the Paul Slayton Trust Agreement Dated February 19, 2002, a Florida trust, is domiciled in Singer Island, Florida.[3]

---

[3]  Upon information and belief, Paul Slayton, who died on or about April 10, 2009, was the initial transferee of a portion of the funds received by the Paul Slayton Trust Agreement Dated April 19, 2002 from the Goldberg Scheme. On or before his death, Paul Slayton transferred all or substantially all of his property to the Paul Slayton Trust

89.     Defendant, Elaine Stein, Trustee of the Elaine Stein 1992 Revocable Trust, a Florida trust, is domiciled in Singer Island, Florida.

90.     Defendant, Jeffrey Stein, is an individual who is domiciled in Haverhill, Massachusetts.

91.     Defendant, Michael Stein, is an individual who is domiciled in Bethesda, Maryland.

92.     Defendant, Robert Stein, is an individual who is domiciled in Singer Island, Florida.

93.     Defendant, Robert Stein, Trustee of the Robert Stein 1992 Revocable Trust, a Florida trust, is domiciled in Singer Island, Florida.

94.     Defendant, Strategem Associates, Inc. ("Strategem"), is a Massachusetts corporation with its principal place of business in Andover, Massachusetts.

95.     Defendant, Thomas J. Ryan Investment Brokers, Inc. ("TJR"), is a Florida corporation with a principal place of business in Fort Lauderdale, Florida.

96.     Defendant, Jeffrey Webster, is an individual who is domiciled in Reno, Nevada.

97.     Defendant, Charles Weeder, is an individual who is domiciled in, Cyprus Gardens, Florida.

---

Agreement Dated April 19, 2002.  Because there were no assets in Paul Slayton's estate after his death, the Palm Beach County Probate Court did not appoint a Personal Representative to administer his estate.

## FACTUAL BACKGROUND AS TO THE DEFENDANTS

98.     By 2007 and 2008, Robert Stein was already both an investor and a Feeder in the Goldberg Scheme, both personally and through Stein, L.P.  These investments included the Diamond Deals, at a rate of return of over 120% and Chase Asset Deals similar to the ones that are the subject of this complaint, but at ever higher rates of return.  In order to profit as a Feeder, to profit from his personal investment in the Goldberg Scheme and to attempt to comply with state and federal securities laws, Robert Stein caused Attorney Santangelo to form the AUG LLCs. Attorney Santangelo also prepared operating agreements, offering memoranda and other documents for the AUG LLCs.

99.     Robert Stein used brokers Thomas J. Ryan ("Tom Ryan"), Jay Marmer and Stuart Cohen, to help him find and convince investors to invest in the Goldberg Scheme through the AUG LLCs (the "Investor Defendants"). Robert Stein and his family members and friends who he brought into the Goldberg Scheme through the AUG LLCs did not have to pay any brokerage commissions and are collectively referred to herein as the "Stein Defendants".  Brokers TJR, Strategem, Jay Marmer and FSS are collectively referred to herein as the "Broker Defendants".   AUG, AUG Partners, the Broker Defendants and the Investor Defendants and Stein Defendants who were members of AUG, are collectively referred to herein as the "AUG Defendants".  AUG II, AUG Partners, the Broker Defendants and the Investor Defendants and Stein

Defendants who were members of AUG II, are collectively referred to herein as the "AUG II Defendants".

100.   **As early as September, 2008**, Jay Marmer and Tom Ryan both expressed concerns to Robert Stein about the legitimacy of the Goldberg Scheme.  Marmer had also invested in the Diamond Deals through Stein, L.P. and was concerned about the Goldberg "red flags" previously identified.

101.   The defendants herein who were also limited partners of Stein, L.P. and therefore had a previous history with Goldberg and his fantastic representations/rates of return are as follows:

| | |
|---|---|
| Robert Stein Trust | Jay Marmer |
| Elaine Stein Trust | Peter Carbone, Trustee |
| Jeffrey Stein | Robert Klein |
| Michael Stein | Gayle Brown |
| Lewis Slayton | Jay Marmer, Trustee for FSS DB Plan |
| Gary Slayton | Shirley Marmer |
| Paul Slayton | Mark Marmer |
| Barry Gorsun | Jeremy Marmer |
| | Stefanie Marmer |
| | Joshua Marmer |
| | Tovah Marmer |

102.   While discussing the Goldberg Scheme in September of 2008 Jay Marmer told Robert Stein about another Ponzi scheme which had recently been uncovered. Robert Stein responded:

> I know there is a lot of this stuff out there.  Michael and Elaine Stein got snared by one from CA.  I know exactly how you feel and I do not blame you because I, too, felt the

same way in the beginning. Therefore, I strongly suggest
and would personally feel better if you wait and see what
Tom's [Ryan] due diligence uncovers and then decide if
you want to invest more, stay pat [sic] or withdraw what
you have already invested. **I know it sounds like a scam
and it may very well be, but I have been unable to ferret
that out.**

(Ex. 78, emphasis added.)[4]

103.   In the same e-mail, Robert Stein told Jay Marmer: "While I believe he

[Goldberg] is straight, **we do not now have a way to protect ourselves from him just**

**walking off with the money, but he did not blink when we raised the subject of**

**workable controls**. But, as both you and Tom have said, there are a lot of schemers out

there." (Emphasis added).

104.   Also in the fall of 2008, Tom Ryan wanted Goldberg or Robert Stein to

describe "why [a] 12% quarterly return is sustainable." (Ex. 46)

105.   In order to manage and assuage the very real concerns investors and

brokers raised about the Goldberg Scheme, Robert Stein and Attorney Santangelo,

established those "workable controls" by structuring the AUG LLCs, and their deals

with Goldberg, such that they could assure potential investors that their capital and

profits would be isolated and protected from both Robert Stein and Goldberg (the "Cash

Control Structure"). (Ex. 1 SANT 00800-00803)

---

[4]   In a series of Rule 2004 examinations prior to the commencement of this case, the Trustee marked 154 exhibits,
some of which are referenced in this complaint by their original numbers for ease of introduction at trial.

106.    Through the Cash Control Structure, all the defendants who invested in the Goldberg Scheme delivered their money directly to Attorney Santangelo's trust account (the "Santangelo Trust Account") rather than giving it to Robert Stein or the AUG LLCs.

107.    Pursuant to the operating agreements of both AUG LLCs, the cash in the Santangelo Trust Account could be invested in the Goldberg Scheme and nowhere else. This cash was  further "controlled"  by going from the  Santangelo Trust Account to Goldberg's attorney,  Michael Clinton's, trust account (the "Clinton Trust Account"), pursuant to an escrow agreement entered into among Goldberg, Attorney Clinton, Attorney Santangelo's Law Firm and the AUG LLCs (the "Cash Control Escrow Agreement").  The Cash Control  Structure was designed by Robert Stein and Attorney Santangelo to assure skeptical Investor Defendants  that neither Goldberg nor Robert Stein could access their cash and  was highlighted in the offering memorandum  for the AUG LLCs:

> The Company and Acquisitions Unlimited Group have agreed to a certain escrow procedure wherein **Investor funds will not be used nor within the reach of Acquisitions Unlimited Group or R. Stein throughout the entire investment cycle.** The Company, through its counsel, will apply its investment  funds  directly  to  Chase  when repossessed  goods  are  being  purchased  by Acquisitions Unlimited Group.  The pre-arranged buyer  will  then  agree  in  its  contract  with Acquisitions Unlimited Group (as a precondition to

> Company's obligation to fund the Chase purchase)
> to wire its payment to an escrow agent who will
> then divide the proceeds between the Acquisitions
> Unlimited Group and the Company.

(Ex. 1 SANT 00723, emphasis added.)

108.   Pursuant to the Cash Control Structure, the Investor Defendants' capital was not only restricted to investments in the Goldberg Scheme, it was to be automatically re-invested with Goldberg unless no acceptable Goldberg deals were available. On the payout of a previous deal with Goldberg, all the defendants' cash went back into the Santangelo Trust Account.   Furthermore, no Investor Defendant was entitled to a return of his capital unless Robert Stein was provided with a written demand at least forty-five days in advance of the due date of a pending Goldberg Scheme payout.

109.   "Profits," fees and commissions (as opposed to capital) were distributed from the Santangelo Trust Account to all the defendants automatically.  Thus, through the Cash Control Structure, all the defendants' cash was paid into and out of the Santangelo Trust Account and was never touched by the AUG LLCs or Robert Stein. In fact, neither of the AUG LLCs even had a bank account or other means to hold investor funds.

110.   The Investor Defendants and the Stein Defendants invested in the Goldberg Scheme through a series of contracts referred to throughout this Complaint as

Contracts One through Six.  Contract One was an AUG II contract involving an initial capital investment of $3,920,000.00 by the Investor Defendants and Stein Defendants set forth on **Schedule A.**  Under the terms of Contract One, Goldberg was to repay the amount invested plus a 12% profit within ninety days of the initial investment.  Of this 12% profit, 7 ½% was to go to the Investor Defendants, 2% was to go to the Broker Defendants[5] (if any), and 2 ½% was to go to AUG Partners (essentially, Robert Stein) as manager of the AUG LLCs.

111.    On  January 28,  2009,  Goldberg  transferred  $3,920,000.00,  plus $470,400.00 in "profits" from Contract One to the Santangelo Trust Account.  The "profits" were then distributed to the AUG II Defendants in the amounts set forth on **Schedule B.**

112.    Towards the end of 2008, many of the defendants' concerns about the legitimacy of the Goldberg Scheme increased due to the arrest and subsequent publicity concerning  Bernie  Madoff  and  other  Ponzi  scheme  operators.    For  example,  on December 22, 2008, Tom Ryan sent Robert Stein two e-mails concerning Madoff and the Tom Petters Ponzi scheme saying that he and other investors were "spooked". (Ex 64)

---

[5]  The Investor Defendants all invested through the Broker Defendants' efforts and thus received 7 ½% "profit".  The Stein Defendants received 9 ½% "profit" per quarter.

113.   Robert Stein responded to Tom Ryan with a carefully crafted e-mail designed to explain how the Cash Control Structure provided protection against a potential Ponzi scheme.

> Lots of shady stuff going on.  The differences are
>
> 1.   Neither Michael or I ever touch the money
> 2.   Money received by escrow agent is deposited into a Chase account by the escrow agent and the account is for deposits only.  No withdrawals of any kind are allowed. EVER. Have letter to that effect from bank.
> 3.   The customer pays the escrow agent, not Michael.
> 4.   If the customer fails to pay, the bank makes good on the principal.
> 5.   We have copies of signed contracts, purchase orders and bank documentation verifying each transaction.
> 6.   We spoke to and got letters from all principal parties.
> 7.   I had my own money invested for over two years.
> 8.   One of my investors just had $250K in principal returned due to a capital call.
> 9.   If Michael was going to run off with the money, he would have done so before signing an escrow agreement putting almost $4 million he totally controlled a few weeks ago, totally and irrevocably out of his reach.

(Ex. 65, emphasis added.)

114.   Notwithstanding these growing concerns, Contract Two was entered into in the end of January 2009 relying on the Cash Control Structure.  It was essentially a rollover of the investments from Contract One, but it involved $3,725,000.00 in capital, because the Stein Defendant Robert Stein Trust withdrew $195,000.00 of his capital from the previous contract.  The amounts invested by each Investor Defendant and Stein

Defendant in Contract Two are set forth on **Schedule C**.   The invested capital of

$3,725,000.00 for Contract Two, plus a 12% "profit" was due from the Goldberg

Scheme at the end of April, 2009.

115.    Contract Three proceeded simultaneously with Contract Two and provided

for a $3,000,000.00 investment in the Goldberg Scheme for goods purportedly to be sold

to UTC.  The division of UTC, which was the purported buyer, was UTC's Hamilton

Sunstrand division ("UTC/Hamilton").  The investment capital plus a 12% "profit" was

to be returned in late April, 2009.  The amounts invested by each Investor Defendant

and Stein Defendants are set forth on **Schedule D**.

116.    Contracts 2 and 3 were due on April 29, 2009 but were not paid by

Goldberg until May 4th and May 7th, 2009 when Goldberg transferred the original

capital, "profit" and fees from Contracts Two and Three directly to the Santangelo Trust

Account in violation of the Cash Control Escrow Agreement.   The capital for both

Contracts Two and Three remained in the Santangelo Trust Account while the "profits"

and fees were distributed to the defendants as set forth on **Schedule E**.

117.    When they received these late payments on Contracts 2 and 3 in early May

of 2009, Robert Stein and Attorney Santangelo realized that the Cash Control Escrow

Agreement had been violated because the payments had come directly from the Debtor,

LLCs' bank account at Bank of America (the "Goldberg Account") and not from the

Clinton Trust Account, as required.  Furthermore, in April, 2009, Attorney Santangelo

and Robert Stein discovered that the Chase employees who had supposedly signed and been copied on an important letter confirming the Chase Asset Protection Clause a mere few weeks earlier were surprisingly no longer employed by Chase. Additionally, this letter refers to "Chase Manhattan Corporate" and uses a Chase Manhattan logo even though Chase Manhattan Bank had merged with JP Morgan in 2000 and had been known for almost a decade as "JP Morgan Chase".

118.    Robert Stein and Attorney Santangelo became extremely concerned that the Cash Control Structure would not protect their and their clients' investments from the fraud they had suspected all along and they issued a memorandum to Goldberg demanding that Goldberg agree to additional "controls" in order to receive any more cash (the "Restructure Demand Memo"):

Memo   May 10, 2009

To: Michael S. Goldberg

From: Carl Santangelo

Re:    Michael S. Goldberg, LLC, d/b/a Acquisitions Unlimited Group/AUG Partners, LLC, AUG, LLC, AUG II, LLC & AUG III, LLC

I am writing this memo to be clear as to what needs to be addressed going forward in your transactions with AUG Partners, LLC and its related entities.

<u>JP Morgan Chase Matters</u>

I need to visit Chase in New York to meet with the person(s) handling your account relationship. Further, given the fact that neither Pat Caffrey nor Kevin Danielson are employed by Chase, I will need a letter from Chase (addressed directly to AUG Partners, LLC and from the person who I will meet) acknowledging the following:

1. That the Chase Capital Protection Clause is in full force and effect;
2. That the letter written by Kevin Danielson, dated March 13, 2009 is ratified;
3. That the Chase sweep account in the name of Michael S. Goldberg, LLC may not, in any circumstance, be assessed by your company; and
4. That in the event the Chase Capital Protection Clause is invoked relating to any deal in which AUG is an investor, the proceeds should be payable to my trust account for further distribution to the participants.

<u>Contract Matters</u>

In light of the fact that Hamilton Sunstrand and Swinerton paid your company directly and the escrow requirements of our contract were violated, Bob Stein has raised deep concerns about our current contractual structure. Accordingly, we will need to have the contact information (name of person handling your account, address & telephone number) of each buyer of goods from your company. We will further need to amend each pending contract whereby AUG will be acknowledged as a participant in such contract so that the buyer will be contractually bound to pay the purchase funds to the escrow agent. The amendment will further state that the material terms of the contract may not be revised or modified without the written consent of AUG. Future contracts will be revised to include these new terms.

(Ex. 11.)

119.   In response to one of the demands above, Goldberg arranged a meeting with "Chase" two days later.  On May 12, 2009, Attorney Santangelo and Goldberg met at a Chase branch in New York with a woman who introduced herself as "Julia Bates," a Chase official.  "Julia Bates" was actually Christine Woods (the "Chase Imposter"), a friend of Goldberg's who was not, and never had been, employed by Chase.

120.   In order to strengthen the Cash Control Structure further, Robert Stein and Attorney Santangelo also demanded that Goldberg restructure their contractual arrangements and the Cash Control Escrow Agreement, so as to further isolate their investor's cash from Goldberg.  After restructuring their arrangement with Goldberg as described below, Contracts Four, Five and Six were funded out of the Santangelo Trust Account.

121.   Notwithstanding the serious concerns expressed in the Restructure Demand Memo, neither Attorney Santangelo nor Robert Stein made any independent effort to contact representatives of the purported pre-arranged buyers, UTC, Bechtel or Swinerton at that time.

122.   Nevertheless, Contracts Four, Five and Six were restructured with Goldberg in May, 2009 as "Contract Participation Agreements" in which the AUG LLCs participated in the Debtor, LLC's  "contracts" with Swinerton, UTC and Bechtel

(the "Pre-Arranged Buyers") in an effort to control the flow of funds from the Pre-Arranged Buyers directly into the Santangelo Trust Account. These Contract Participation Agreements were buttressed by outright assignments of Goldberg's contracts with the Pre-Arranged Buyers to Attorney Santangelo as Escrow Agent (the "Contract Assignments"). Under this revised Cash Control Structure, the Pre-Arranged Buyers were to pay the entire amount due under their contracts with the Debtor, LLC to the Santangelo Trust Account, including Goldberg's "cut" of the purchase price for the Chase Assets. Surprisingly, neither the Contract Participation Agreements nor the Contract Assignments included any Pre-Arranged Buyer as a party or signatory.

123.    Contract Four purported to be a Swinerton contract in the amount of $3,725,000.00 with the principal investment of each AUG II Defendant set forth on **Schedule F**.

124.    Contract Five purported to be a UTC contract in the amount of $3,000,000.00 with the principal amount invested by each AUG Defendant set forth on **Schedule G**.

125.    Contract Six purported to be a contract with Bechtel in the amount of $2,184,800.00 with the principal amount invested by each AUG Defendant set forth on **Schedule H**.

126.    In late May, 2009, while all of these machinations were occurring, Investor Defendant Matthew Greer, expressed to his broker, Tom Ryan, both his and

other investors' continuing concerns that the Goldberg Scheme might be a Ponzi scheme. Mr. Greer stated: **"everyone is still scared of the Madoff factor: if they returned (sic) for the risks are too good to be true, then they must be.'"** (Ex. 68, emphasis added.)

127.   Tom Ryan, Mr. Greer's broker, forwarded Mr. Greer's concerns to Robert Stein, who reassured Ryan that "the best way to overcome the 'Madoff factor' is through a thorough due diligence process." (Ex. 69)

128.   That same day, in response to these continuing "too good to be true" concerns expressed by existing and potential investors, Tom Ryan sent a proposed solicitation letter to new investors to Robert Stein and Attorney Santangelo for their approval.  In his letter, Tom Ryan described the Cash Control Structure for investors as follows: "in every transaction the principal and profit participation are returned the [sic] Carl Santangelo's trust account **to avoid the appearance of a Ponzi or Madoff scheme."** (Ex. 71.)  Emphasis added.  Also in late May, 2009, in a separate draft solicitation letter to attract potential new investors, Robert Stein's son, Jeffrey Stein, who was a member of the manager of the AUG, LLC's and is a Broker Defendant, detailed the merits of their Cash Control Structure:

> from the outset because of the tremendous ROI we offer, we were met with raised eyebrows (and more than a few references to Madoff). **To help alleviate investor concerns and to create a completely secure investment, we have implemented a system whereby the money**

> **never goes through the hands of the intermediary.  In
> fact, the money never goes through our hands, either**.
> Investors send money to an escrow agent to deposit the
> funds into a Chase account from which only Chase can
> make withdrawals.  The third party cusotomers [sic] pay
> the escrow agent who distributes the profits and principal
> to the individual investors.  All of the profits and principal
> are returned to the escrow agent before an [additional]
> investment is made. **There is zero opportunity for your
> money to be stolen by the intermediary or AUG LLC.**

(Ex. 73, emphasis added.)

129.    Although the Contract Participation Agreements and the Contract
Assignments executed by Goldberg purportedly granted direct rights in the Chase Asset
sale contracts with the Pre-Arranged Buyers, Goldberg suspiciously insisted on language
that restricted contact with these companies to e-mail communications at addresses
provided by Goldberg, with no direct contact by Robert Stein or Attorney Santangelo
permitted.

130.    Even though they had been relying on the Cash Control Structure to
protect them from the fraud they suspected, in early July 2009, Attorney Santangelo and
Robert Stein finally began to perform the kind of due diligence on the Goldberg Scheme
they could and should have performed all along.  On July 7, 2009, Attorney Santangelo
determined that the e-mail addresses for the Chase Imposter, Swinerton, UTC and
Bechtel that he had been given by Goldberg were all phony and had all been established
by the same individual, Angelo Scalise, a resident of Rocky Hill, Connecticut.  Also, on

July 7, 2009, Attorney Santangelo performed a reverse telephone search on the phone number on the business card he had received from the Chase Imposter in New York a few weeks earlier and determined that the telephone number for "Julia Bates" was actually the phone number of the Chase Imposter, Christine Woods, a woman living in Bronx, New York City.   On the same day that Attorney Santangelo discovered that the e-mail addresses Goldberg had given him were fraudulent, and that "Julia Bates" was an imposter, he sent copies of the purported Contract Assignments to Swinerton, UTC/Hamilton and Bechtel, not by e-mail as required by Goldberg, but by Federal Express.

131.   One of these packages was sent to Brian Gleason at UTC/Hamilton because he was the signatory on Goldberg's contract with UTC/Hamilton and the person Goldberg had identified to Robert Stein and Attorney Santangelo as his contact.   After receiving Attorney Santangelo's notice of assignment of Goldberg's UTC/Hamilton contract, about which he knew nothing, on July 9, 2009, Brian Gleason called Attorney Santangelo and stated: "I am not a purchasing agent with Hamilton.   I do not make agreements for them."

132.   According to Brian Gleason's deposition testimony, Attorney Santangelo "just seemed very frustrated and concerned and just said, you know, so you don't make contracts for Hamilton and have not made a contract with them or with Goldberg?   I said

yes." As a result, by no later than July 9, 2009, Robert Stein and Attorney Santangelo knew with certainty that the Goldberg Scheme was a Ponzi scheme.

133.   Now certain that the Goldberg Scheme was a Ponzi Scheme, in late July, 2009, Attorney Santangelo asked Goldberg to arrange another meeting for him at Chase with the Chase Imposter (who Santangelo knew to be a fake), Mr. Goldberg and a new potential investor, Attorney Santangelo's horse racing buddy, Nelson Obus. Mr. Obus is a hedge fund manager for Wynnefield Capital in New York City. Attorney Santangelo arranged the meeting by telling Goldberg that Wynnefield Capital was potentially interested in investing in the Goldberg Scheme.

134.   On August 4, 2009, Mr. Obus, Attorney Santangelo, Mr. Goldberg, and the Chase Imposter met at Chase to discuss Wynnefield Capital's alleged interest in the Goldberg Scheme.

135.   Before the meeting, Attorney Santangelo informed Mr. Obus that he wanted him to evaluate the bona fides of Goldberg and the Goldberg Scheme.

136.   Shortly after the meeting, Mr. Obus informed Attorney Santangelo that he had no intention of investing in the Goldberg Scheme and that he was not sure that the Goldberg Scheme was a legitimate investment.

137.   In deposition testimony, Mr. Obus had this to say about the meeting and the returns the defendants were getting from the Goldberg Scheme:

Q.      And did either Mr. Santangelo or Mr. Goldberg ever tell you that he was paying, as part of the deal, a total amount of 12 percent per quarter?

A.      Paying who?

Q.      Paying the group – his group – the group of investors and brokers.

A.      Oh, 12 percent a quarter?

Q.      Yes.

A.      That would be 50 percent annual.  That seems – I don't think those numbers were thrown my way.  I was concerned with the numbers he threw my way which were lower.

Q.      Right.  If you had heard the 12 percent per quarter, what would your reaction have been?

A.      I wouldn't have even gone.

Q.      And the reason you would not have gone is because?

A.      Nobody gets those returns.

138.    On August 12, 2009, a little more than a week after the meeting between Mr. Obus, Goldberg, Attorney Santangelo and the Chase Imposter, Attorney Santangelo sent an e-mail to Mr. Obus stating:

> **if you are contacted by Michael Goldberg re your investment in Acquisitions Unlimited Group, I want you to know what we have told him.  We have said that we are working on a contract with your lawyers and are on track to fund the full $10M of your investment in the first week of September.  Let me know if Goldberg calls you.  He is due to pay off our current investment contracts early next week so he may want to doublecheck that your money is coming in before he pays us.**

(Obus Ex 4, emphasis added.)

139.   On August 21, 2009 in order to lessen the financial pressure on Goldberg when paying the amounts due on their outstanding contracts, Attorney Santangelo sent letters via e-mail to each of the phony e-mail addresses pretending to tell Swinerton, UTC and Bechtel that they needed only to pay the AUG LLC's portion of the assigned contracts and that the Goldberg's portion could be paid directly to him.   Of course, at this point, Attorney Santangelo knew he was, in actuality, communicating with Goldberg and not the pre-arranged buyers.

140.   At least in part because of these machinations engaged in by Attorney Santangelo, between August 20, 2009 and September 2, 2009, Goldberg transferred a total of $9,978,976.00 into the Santangelo Trust Account, representing a capital re-payment of $5,184,800 to the AUG Defendants, a capital re-payment of $3,725,000.00 to the AUG II Defendants and "profits" and fees of $622,000.00 to the AUG Defendants and "profits" and fees of $447,000.00 to the AUG II Defendants. Attorney Santangelo immediately distributed the "profits" and fees, but did not return the defendants' capital until September 10, 2009.

141.   The dates, amounts of capital, "profits" and fees distributed for Contracts Four, Five and Six are set forth on **Schedule I**.  The total amount distributed to each defendant of capital, "profits" and fees and the amounts and dates of each transfer are set forth on **Schedule J.**

142.   After Attorney Santangelo had received the final transfers from the Debtor into his trust account, Robert Stein and Attorney Santangelo finally confronted Goldberg with his lies but were only willing to do so in a public place with security cameras and armed guards.

### First Claim for Relief
**(Preferential Transfers Against The AUG and AUG II Defendants)**
**11 U.S.C. §§ 547, 550(a), 550(c) and 551**

143.   Paragraphs 1-142 of this Complaint are repeated and re-alleged as if fully set forth herein.

144.   Between August 20, 2009 and September 2, 2009, the Debtors made transfers as set forth on **Schedule K** to the AUG Defendants and the AUG II Defendants (the "AUG LLCs' Preferential Transfers").

145.   The AUG LLCs' Preferential Transfers were made on or within 90 days of the Petition Date.

146.   The AUG LLCs' Preferential Transfers constitute transfers of the Debtor's interest in property.

147.   The AUG LLCs' Preferential Transfers were for or on account of antecedent debts owed to or for the benefit of the AUG Defendants and AUG II Defendants respectively.

148.   The Debtors made the AUG LLCs' Preferential Transfers while insolvent.

149.    The AUG LLCs' Preferential Transfers enabled the AUG Defendants and AUG II Defendants to receive more than they would have received if (a) the Debtor's case was a case under Chapter 7 of the Bankruptcy Code, (b) the AUG LLCs' Preferential Transfers had not been made, and (c) the AUG Defendants and AUG II Defendants had received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

150.    As set forth above, the AUG Defendants and AUG II Defendants did not receive the AUG LLCs' Preferential Transfers in good faith for value and without knowledge of the avoidability of such transfers.

151.    The Trustee is entitled pursuant to Bankruptcy Code § 547 to avoid the AUG LLCs' Preferential Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from the AUG Defendants and AUG II Defendants, for the benefit of the estate, the property transferred or the value of such property, plus interest because the AUG LLCs' Preferential Transfers were made by the Debtor either:    (a) directly to the AUG Defendants and AUG II Defendants; (b) to the AUG Defendants and the AUG II Defendants through the mere conduits of AUG and AUG II respectively; (c) to the AUG Defendants and the AUG II Defendants as part of an overall scheme which the Court should collapse under applicable law and treat the AUG Defendants and the AUG II Defendants as initial transferees of the AUG LLCs' Preferential Transfers; (d) to AUG and AUG II for the benefit of the AUG Defendants and the AUG II Defendants

respectively; or (e) to AUG and AUG II respectively and then transferred by AUG and AUG II to the AUG Defendants and the AUG II Defendants as subsequent transferees who did not take for value and in good faith.

## Second Claim for Relief
### (Bankruptcy Code Intentional Fraudulent Transfers Against The AUG and AUG II Defendants)
### 11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551

152.    Paragraphs 1-151 of this Complaint are repeated and re-alleged as if fully set forth herein.

153.    Between January 29, 2009 and September 10, 2009, the Debtor made the transfers set forth on **Schedule J** to the AUG Defendants and AUG II Defendants (the "AUG LLCs' Two Year Transfers").

154.    The AUG LLCs' Two Year Transfers were made by the Debtor with the actual intent to hinder, delay and defraud the Debtor's creditors.

155.    The AUG LLCs' Two Year Transfers constitute transfers of the Debtor's interest in property.

156.    As set forth above, the AUG Defendants and AUG II Defendants did not receive the AUG LLCs' Two Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

157.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid

the AUG LLCs' Two Year Transfers and,  pursuant to Bankruptcy Code §§ 550(a) and 551,

to recover from the AUG Defendants and AUG II Defendants, for the benefit of the estate,

the property transferred or the value of such property, plus interest, because the AUG LLCs'

Two Year  Transfers were made by the Debtor either:  (a) directly to the AUG Defendants

and AUG II Defendants; (b)  to the AUG Defendants and the AUG II Defendants through

the mere conduits of AUG and AUG II respectively; (c) to the AUG Defendants and the

AUG II Defendants as part of an overall scheme which the Court should collapse under

applicable law and treat the AUG Defendants and the AUG II Defendants  as initial

transferees of the AUG LLCs' Two Year Transfers; (d) to AUG and AUG II for the

benefit of the AUG Defendants and the AUG II Defendants respectively; or (e) to AUG

and  AUG II  respectively  and  then  transferred  by  AUG  and  AUG II  to  the  AUG

Defendants and the AUG II Defendants as subsequent transferees who did not take for

value and in good faith.

**Third Claim for Relief**
**(Constructive Fraudulent Transfers Against The AUG and AUG II**
**Defendants)**
**§§ 548(a)(1)(B),  550(a) and 551)**

158.    Paragraphs 1-157 of this Complaint are repeated and re-alleged as if fully set forth herein.

159.    The Debtor received less than reasonably equivalent value in exchange for each of the AUG LLCs' Two Year Transfers.

160.    At the time of each of the AUG LLCs' Two Year Transfers, the Debtor was insolvent, or became insolvent, as a result of each of the AUG LLCs' Two Year Transfers.

161.    At the time of each of the AUG LLCs' Two Year  Transfers,  the Debtor was engaged in business or transactions, or was about to engage in  business or transactions for which any property remaining of the Debtor constituted unreasonably small capital.

162.    At the time of each of the AUG LLCs' Two Year Transfers, the Debtor intended to incur, or believed that it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

163.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(B) to avoid the AUG LLCs' Two Year Transfers and,  pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from the AUG Defendants and AUG II Defendants, for the benefit of the estate,

the property transferred or the value of such property, plus interest because the AUG LLCs'

Two Year Transfers were made by the Debtor either: (a) directly to the AUG Defendants

and AUG II Defendants; (b) to the AUG Defendants and the AUG II Defendants through

the mere conduits of AUG and AUG II respectively; (c) to the AUG Defendants and the

AUG II Defendants as part of an overall scheme which the Court should collapse under

applicable law and treat the AUG Defendants and the AUG II Defendants as initial

transferees of the AUG LLCs' Two Year Transfers; (d) to AUG and AUG II for the

benefit of the AUG Defendants and the AUG II Defendants respectively; or (e) to AUG

and AUG II respectively and then transferred by AUG and AUG II to the AUG

Defendants and the AUG II Defendants as subsequent transferees who did not take for

value and in good faith.

### Fourth Claim for Relief
**(CUFTA Intentional Fraudulent Transfer Against The AUG and AUG II
Defendants)
11 U.S.C. §§ 544 (b)(1), 550(a) and 551 and Conn. Gen. Stat. § 52-552e(a)(1),
and § 52-552h(a)**

164.    Paragraphs 1-163 of this Complaint are repeated and re-alleged as if fully

set forth herein.

165.    The AUG LLCs' Two Year Transfers were made by the Debtor with the

actual intent to hinder, delay or defraud the Debtor's creditors.

166.   The AUG LLCs' Two Year Transfers constituted fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

167.   At all times relevant to the AUG LLCs' Two Year Transfers, there have been creditors who have held and still hold matured or unmatured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

168.   The Trustee is entitled pursuant to Bankruptcy Code §544(b)(1) and Conn. Gen. Stat. § 52-552e(a)(1) to avoid the AUG LLCs' Two Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a), to recover from the AUG Defendants and AUG II Defendants, for the benefit of the estate, the property transferred or the value of such property, plus interest because the AUG LLCs' Two Year Transfers were made by the Debtor either: (a) directly to the AUG Defendants and AUG II Defendants; (b) to the AUG Defendants and the AUG II Defendants through the mere conduits of AUG and AUG II respectively; (c) to the AUG Defendants and the AUG II Defendants as part of an overall scheme which the Court should collapse under applicable law and treat the AUG Defendants and the AUG II Defendants as initial transferees of the AUG LLCs' Two Year Transfers; (d) to AUG and AUG II for the benefit of the AUG Defendants and the AUG II Defendants respectively; or (e) to AUG and AUG II respectively and then transferred by AUG and AUG II to the AUG

Defendants and the AUG II Defendants as subsequent transferees who did not take for value and in good faith.

### Fifth Claim for Relief
**(CUFTA Constructive Fraudulent Transfers Against The AUG and AUG II Defendants)**
**11 U.S.C. §§ 544(b)(1), 550(a) and 551 and Conn. Gen. Stat. §§ 52-552e(a)(2), 52-552f(a) and 52-552h(a)**

169.    Paragraphs 1-168 of this Complaint are repeated and re-alleged as if fully set forth herein.

170.    The Debtor received less than reasonably equivalent value in exchange for each of the AUG LLCs' Two Year Transfers.

171.    At the time of each of the AUG LLCs' Two Year Transfers, the Debtor was insolvent, or became insolvent, as a result of each of the AUG LLCs' Two Year Transfers.

172.    At the time of each of the AUG LLCs' Two Year Transfers, the Debtor was engaged in business or transactions, or was about to engage in business or transactions for which any property remaining of the Debtor constituted unreasonably small capital.

173.    At the time of each of the AUG LLCs' Two Year Transfers, the Debtor intended to incur, or believed that it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

174.    At all times relevant to the AUG LLCs' Two Year Transfers, there have been creditors who have held and still hold matured or unmatured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

175.    The Trustee is entitled pursuant to 11 U.S.C. §544(b)(1) and Conn. Gen. Stat. §§52-552e(a)(2) and 52-552f(a) to avoid the AUG LLCs' Two Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a),  to recover from the AUG Defendants and AUG II Defendants, for the benefit of the estate, the property transferred or the value of such property, plus interest because the AUG LLCs' Two Year Transfers were made by the Debtor either: (a) directly to the AUG Defendants and AUG II Defendants; (b) to the AUG Defendants and the AUG II Defendants through the mere conduits of AUG and AUG II respectively; (c) to the AUG Defendants and the AUG II Defendants as part of an overall scheme which the Court should collapse under applicable law and treat the AUG Defendants and the AUG II Defendants  as initial transferees of the AUG LLCs' Two Year Transfers; (d) to AUG and AUG II for the benefit of the AUG Defendants and the AUG II Defendants respectively; or (e) to AUG and AUG II respectively and then transferred by AUG and AUG II to the AUG Defendants and the AUG II Defendants as subsequent transferees who did not take for value and in good faith.

### Sixth Claim for Relief
### (Illegal Member Distribution)
### (Against the AUG Defendants other than AUG)
### Fla. Stat. § 608.426

176.   Paragraph 1-175 are repeated and re-alleged as if fully set forth herein.

177.   In the event that the AUG LLCs are determined to be initial transferees of the transfers alleged herein, between August 24, 2009 and September 10, 2009, Robert Stein caused AUG to distribute to the AUG Defendants the amounts set forth on **Schedule L**.   After this distribution AUG had no assets and was therefore rendered insolvent by such distribution.

178.   Pursuant to Fla. Stat. § 608.426(1), "no distribution may be made if after the distribution, the limited liability company would be insolvent".

179.   Pursuant to Fla. Stat. § 608.426(3), a manager or managing member who votes for or assents to a distribution made in violation of this section is personally liable for said distribution.   Accordingly, under Florida law and other applicable law, Robert Stein as the manager of AUG who voted for or assented to the distributions on **Schedule L**, is liable to the Trustee for all amounts distributed.

180.   In addition, by directing AUG Partners to cause AUG to distribute all of its assets to its members at a time when Robert Stein knew  that such distribution would render AUG insolvent, Robert Stein so dominated and controlled the affairs of AUG Partners as to control it utterly.   Moreover, these actions utilized AUG Partners as a

means by which to shield the assets of the AUG Defendants from creditors warranting

piercing of the corporate veil so as to render Robert Stein personally liable for all the

distributions made to the AUG Defendants as set forth on **Schedule L**.

181.    As a creditor of AUG, the Trustee has standing to sue the managers who

authorized, and the members who received, the unlawful distributions from an insolvent

LLC.  Colborne Corp. v. Weinstein, 2010 Colo. App. LEXIS 58 (Colo. App. Div. 3,

2010), cert granted, 2010 Colo. LEXIS 606 (Colo. 2010).[6]

182.    Pursuant to Fla. Stat. § 608.428(1) and 608.428(2), a member who

receives an illegal distribution, such as one that will render the LLC insolvent, is liable to

the LLC to the extent of the distribution received.

183.    Accordingly, the AUG Defendants are also liable to the Trustee for all

distributions as set forth in **Schedule L**.

**Seventh Claim for Relief**
**(Illegal Member Distribution)**
**(Against the AUG II Defendants other than AUG II)**
**Fla. Stat. § 608.426**

184.    Paragraph 1-183 are repeated and re-alleged as if fully set forth herein.

185.    In the event that the AUG LLCs are determined to be initial transferees of

the transfers alleged herein, between August 24, 2009 and September 10, 2009, Robert

---

[6]  No Florida case has analyzed creditor's standing under this statute, but under a virtually identical statute in
Colorado, the court found such standing to exist.

Stein caused AUG II to distribute to the AUG II Defendants the amounts set forth on **Schedule N**. After this distribution AUG II had no assets and was therefore rendered insolvent by such distributions.

186.   Pursuant to Fla. Stat. § 608.426(1), "no distribution may be made if after the distribution, the limited liability company would be insolvent".

187.   Pursuant to Fla. Stat. § 608.426(3), a manager or managing member who votes for or assents to a distribution made in violation of this section is personally liable for said distribution. Accordingly, under Florida law and other applicable law, Robert Stein as the manager of AUG II who voted for or assented to the distributions on **Schedule M**, is liable to the Trustee for all amounts distributed.

188.   In addition, by directing AUG Partners to cause AUG II to distribute all of its assets to its members at a time when Robert Stein knew that such distribution would render AUG II insolvent, Robert Stein so dominated and controlled the affairs of AUG Partners as to control it utterly. Moreover, these actions utilized AUG Partners as a means by which to shield the assets of the AUG II Defendants from creditors warranting piercing of the corporate veil so as to render Robert Stein personally liable for all the distributions made to the AUG II Defendants as set forth on **Schedule M**.

189.   As a creditor of AUG II, the Trustee has standing to sue the managers who authorized and the members who received the unlawful distributions from an insolvent

LLC. <u>Colborne Corp. v. Weinstein</u>, 2010 Colo. App. LEXIS 58 (Colo. App. Div. 3, 2010), <u>cert granted</u>, 2010 Colo. LEXIS 606 (Colo. 2010).

190.    Pursuant to Fla. Stat. § 608.428(1) and 608.428(2), a member who receives an illegal distribution, such as one that will render the LLC insolvent, is liable to the LLC to the extent of the distribution received.

191.    Accordingly, the AUG II Defendants are also liable to the Trustee for all distribution as set forth in **Schedule M**.

**Eighth Claim for Relief**
**(FUFTA Intentional Fraudulent Transfers by AUG and AUG II Against the AUG and AUG II Defendants)**
**Fla. Stat. § 726.105(1)(A)**

192.    Paragraphs 1-191 are repeated and re-alleged as if fully set forth herein.

193.    As of January 29, 2009 the Trustee was a future creditor of AUG and AUG II within the meaning of Fla. Stat. § 726.102(3)(4).

194.    In the event that the AUG LLCs are determined to be initial transferees of the transfers alleged herein, from January 29, 2009 through September, 2009, AUG and AUG II, through the efforts of their managing members AUG Partners and Robert Stein, made the transfers set forth on **Schedule J** to the AUG Defendants and the AUG II Defendants (the "Florida Intentional Fraudulent Transfers").

195.   The Florida Intentional Fraudulent Transfers were fraudulent as to the Trustee, in violation of Fla. Stat. § 726.105(1)(a), because they were made with the actual intent to hinder, delay or defraud  AUG's and AUG II's present and/or future creditors.

196.   The AUG Defendants and AUG II Defendants, as discussed above, did not take in good faith and for **reasonably equivalent** value, as defined in Fla. Stat. § 726.109(a).  Moreover, to the extent necessary, the Trustee is entitled to recover from any subsequent transferees pursuant to Fla. Stat. § 726.109(2).

197.   Pursuant to Fla. Stat. § 726.108, the Trustee is entitled to avoid the Florida Intentional Fraudulent Transfers to the extent necessary to satisfy the Trustee's claim and recover these amounts for the benefit of the estates from the AUG and AUG II Defendants.

### Ninth Claim for Relief
### (FUFTA Intentional Fraudulent Transfers by AUG Partners)
### (Against Robert Stein, Elaine Stein, Jeffrey Stein and Michael Stein)
### Fla. Stat. § 726.105(1)(A)

198.   Paragraph 1-128 and 163-197 are repeated and re-alleged as if fully set forth herein.

199.   Throughout 2009, as described in the tax returns of AUG Partners, AUG Partners made the transfers set forth on **Schedule N** (the "AUG Partners' Intentional Fraudulent Transfers") to Robert Stein, Elaine Stein, Michael Stein and Jeffrey Stein (the "AUG Partners' Defendants").

200.    Commencing in January, 2009 the Trustee, was a future creditor of AUG Partners, within the meaning of Fla. Stat. § 726.102(3) and (4).

201.    The AUG Partners' Fraudulent Transfers were fraudulent as to the Trustee in violation of Fla. Stat. § 726.105(1)(a) because they were made with the actual intent to hinder, delay or defraud AUG Partners' present and/or future creditors.

202.    The AUG Partners' Defendants, as discussed above, did not take in good faith and for **reasonably equivalent** value as defined in Fla. Stat. § 726.109(a). Moreover, to the extent necessary, the Trustee is entitled to recover from any subsequent transferees pursuant to Fla. Stat. § 726.109(2).

203.    Pursuant to Fla. Stat. § 726.108, the Trustee is entitled to avoid the AUG Partners' Intentional Fraudulent Transfers to the extent necessary to satisfy the Trustee's claim and to recover those amounts from the AUG Partners' Defendants for the benefit of the Estate.

### Tenth Claim for Relief
### Unjust Enrichment as to the AUG and AUG II Defendants

204.    Paragraphs 1-203 are repeated and re-alleged as if fully set forth herein.

205.    The AUG Defendants and AUG II Defendants received false "profits" from the Goldberg Scheme as set forth on **Schedule O**.

206.    As investors in a Ponzi scheme, the AUG and AUG II Defendants received benefits in the form of false "profits", and otherwise, for which they have not

paid under circumstances in which it would be inequitable to permit them to retain such benefits.

207.   Accordingly, the AUG and AUG II Defendants have been unjustly enriched at the expense of the Trustee and these estates and their creditors.

For the reasons set forth above, the plaintiff seeks:

(a)     Damages;

(b)     Avoidance of the transfers as set forth above;

(c)     A Judgment directing that the transfers set forth above be set aside and recovered for the benefit of the estates;

(d)     A permanent injunction against all defendants from transferring or disposing from any assets during the pendency of this bankruptcy case;

(e)     Attorney's fees;

(f)     Prejudgment interest;

(g)     Costs;

(h)     The appointment of receivers for AUG, AUG II and AUG Partners; and

(i)     Such other and further relief as the Court deems just and proper.

Dated at Bridgeport, Connecticut this 10th day of February, 2011.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE ESTATES OF
MICHAEL S. GOLDBERG AND
MICHAEL S. GOLDBERG, LLC

By_____

Jeffrey Hellman (ct04102)
Ted Horwitt (ct04778)
Lawrence S. Grossman (ct15790)
ZEISLER & ZEISLER, P.C.
558 Clinton Avenue
Bridgeport, Connecticut 06605
(203) 368-4234
(203) 367-9678 (fax)
jhellman@zeislaw.com