## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| MICHAEL S. GOLDBERG, LLC | ) Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG | )        09-23371 (ASD) |
| | ) |
| Debtors. | ) Jointly Administered Under |
| | ) Case No. 09-23370 |
| | ) |
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE | ) |
| ESTATES OF MICHAEL S. GOLDBERG, LLC, and MICHAEL | ) |
| S. GOLDBERG | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| STUART J. COHEN, et al. | ) Adv. Pro. No. 11-02013 |
| | ) |
| | ) |
| | ) |
| Defendants. | |

### AFFIDAVIT OF JAMES BERMAN

STATE OF CONNECTICUT)
                     )        ss: Bridgeport; March 31, 2011
COUNTY OF FAIRFIELD  )

I, James Berman, being duly sworn, hereby depose and say:

1.      I am over the age of eighteen and I understand the obligations of an oath.

1

2.    I make this Affidavit based upon my review of documents relevant to the Complaint, including deposition transcripts and the Goldberg Plea Agreement; and upon my and my agents' conversations with Michael Goldberg and other people connected to the Goldberg Scheme.

3.    I am the duly appointed Chapter 7 Trustee for the Estates of Michael S. Goldberg ("Goldberg") and Michael S. Goldberg, LLC (the "Debtor LLC").

4.    The $11.8 million of preferential and fraudulent transfers that I seek to recover in this action were transferred to the Defendants in furtherance of a classic and pure Ponzi Scheme (the "Goldberg Scheme") [1] which was conducted over the last 12 years by Goldberg and the Debtor, LLC (collectively, the "Debtor" or the "Debtors").[2]

---

[1]  A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924).  In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme.  See Bear Stearns Servs. Corp. v. Gredd., 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also  In re: Unified Commercial Capital Inc.  260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.  Typically, investors are promised larger returns for their investments.  Initial investors are actually paid the promised returns, which attracts additional investors.").  There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., 387 B,R. at 8-10.  See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS  28075*63 (S.D.N.Y. 2010).

[2]  Capitalized terms used herein but not defined herein shall have the meanings set forth in the Complaint.  To further assist the reader, a glossary of defined terms is attached hereto.  In the case of any definitional conflict among this Affidavit, and the glossary and the Complaint, the definitions in the Complaint shall control.

2

5.      Goldberg represented to investors that he and/or the Debtor LLC were engaged in primarily two types of business deals.  First, in the early years of the Goldberg Scheme (but continuing throughout), Goldberg represented that he could purchase diamonds at extremely low wholesale prices on the New York City diamond exchange and resell those diamonds for a profit sufficient to pay investors in these diamond liquidation contracts a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Deals").   The Diamond Deals also purported to grant investors a security interest in the diamonds supposedly purchased for re-sale.

6.      The second and more recent set of deals involved significantly more investor funds and were based on Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of "Chase Manhattan Bank" (which tellingly has been publicly known as JP Morgan Chase, N.A. ("Chase") since 2000).   Goldberg represented that he had a contractual right to purchase foreclosed business assets (such as structural steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals").   Goldberg told investors that his relationship with Chase was governed by a 1999 contract between the Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

3

7.      Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major companies such as United Technologies Corporation ("UTC"), Bechtel Corporation, Bausch and Lomb, Swinerton Builders and others (the "Pre-Arranged Buyers").

8.      Goldberg represented to investors that the Chase Asset Deals were "risk-free" because the purported Chase Master Agreement contained a "Contract Dissolution Capital Protection Clause" which obligated Chase to repurchase the foreclosed business assets for the full amount of the purchase price if Goldberg was unable to close on the sale of the Chase Assets to the Pre-Arranged Buyer.

9.      Notably, the Goldberg Scheme did not involve any legitimate or actual business or investment activity by the Debtors.  All the funds used to pay investors came from other investors.  In this sense, it was a pure Ponzi scheme.

10.     On or about November 16, 2009, Goldberg admitted to federal law enforcement officials that his sole source of payment to investors was the funds that he obtained from other investors.  On September 13, 2010, Goldberg entered a plea of guilty to federal wire fraud charges in connection with his operation of the Goldberg Scheme pursuant to the Plea Agreement attached hereto as **Exhibit A**.  In the Plea Agreement, Goldberg admitted:

> **In fact, and as the defendant well knew, each and
> every one of the defendant's representations
> were false:   aside from during the first six**

4

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

months of his scheme, the defendant did not purchase diamonds in New York City or any other location; the defendant did not have any relationship, contractual or otherwise, with Chase; the defendant did not purchase any foreclosed and seized assets from Chase, nor did he resell any foreclosed and seized assets. In truth and in fact, the defendant paid the promised returns to existing investors with funds he received from new investors or reinvested funds.

11.    On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed involuntary petitions for relief under Chapter 7 of the Bankruptcy Code against the Debtors. The Trustee was subsequently elected to liquidate and distribute all assets of the Debtors' estates, including avoidance actions to recover preferences and fraudulent conveyances such as those that are the subject of the Complaint.

12.    By 2007 and 2008, Defendant Robert Stein was already both an investor and a Feeder in the Goldberg Scheme, both personally and through his limited partnership, R. Stein & Co., L.P. ("Stein, LP"). These investments included the Diamond Deals, at an annual rate of return of over 120% and Chase Asset Deals similar to the ones that are the subject of the Complaint, but at higher rates of return. In order to profit as a Feeder, to profit from his personal investment in the Goldberg Scheme and to attempt to comply with state and federal securities laws, Robert Stein caused his Attorney, Carl Santangelo, to form the AUG LLCs as investment vehicles for sophisticated investors to

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

invest in the Goldberg Scheme. Attorney Santangelo prepared the operating agreements, offering memoranda and other documents for the AUG LLCs.

13.    Robert    Stein    used    broker    Thomas J.    Ryan    ("Tom    Ryan"), Defendant/broker Jay Marmer and Defendant/broker Stuart Cohen, to help him find and convince sophisticated and accredited investors[3] to invest in the Goldberg Scheme through the AUG LLCs (the "Investor Defendants").   The Investor Defendants are identified on **Exhibit B** hereto.  Brokers TJR, Strategem, Jay Marmer and FSS are the individuals and entities who acted as the brokers to bring in the Investor Defendants, are

---

[3]   Under federal securities law, an accredited investor is defined as:

1.   a bank, insurance company, registered investment company, business development company or small business investment company.

2.   an employee benefit plan, within the meaning of the Employee Retirement Income Security Act, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5 million;

3.   a charitable organization, corporation, or partnership with assets exceeding $5 million;

4.   a director, executive officer, or general partner of the company selling the securities;

5.   a business in which all the equity owners are accredited investors;

6.   a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase, excluding the value of their primary residence;

7.   a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year;

8.   a trust with assets in excess of $5 million, not formed to acquire the securities offered, whose purchases a sophisticated person makes; or

9.   any entity in which all of the equity owners are accredited investors.

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

collectively referred to herein as the "Broker Defendants" and are identified on Exhibit B.

Robert Stein and his family members and friends who he personally brought into the

Goldberg Scheme and who did not come in through brokers are collectively referred to

herein as the "Stein Defendants "and are identified on Exhibit B.  AUG, AUG Partners,

the Broker Defendants and those Investor Defendants and Stein Defendants who were

members of AUG, are collectively referred to herein as the "AUG Defendants" and

identified on **Exhibit B**.  AUG II, AUG Partners, the Broker Defendants and those

Investor Defendants and Stein Defendants who were members of AUG II, are

collectively referred to herein as the "AUG II Defendants" and are identified on

**Exhibit B** hereto.  All of the defendants herein are sometimes collectively referred to as

the "Defendants".

      14.     Those Defendants who were also limited partners of Stein, L.P. and who

therefore had a previous history with Goldberg and his fantastic representations/rates of

return are as follows:

| | |
|---|---|
| Robert Stein Trustee | Jay Marmer |
| For the Robert Stein 1992 | Peter Carbone, Trustee, Peter P. Carbone Trust |
| Trust | Robert Klein |
| Elaine Stein Trustee, | Gayle Brown |
| For the Elaine Stein 1992 | Jay Marmer, Trustee for FSS DB Plan |
| Trust | Shirley Marmer |
| Jeffrey Stein | Mark Marmer |
| Michael Stein | Jeremy Marmer |
| Lewis Slayton | Stefani Marmer |
| Gary Slayton | Joshua Marmer |
| Paul Slayton | Mark Marmer |

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

Barry Gorsun                Tovah Marmer

15.    **As early as September, 2008**, Jay Marmer and Tom Ryan both expressed concerns to Robert Stein about the legitimacy of the Goldberg Scheme. Marmer had also invested in the Diamond Deals through Stein, L.P. and was concerned about the numerous Goldberg "red flags" that were of concern to most investors, including the outrageous rates of return, the "no risk" guaranty and the lack of sophistication evinced by both Goldberg himself and the paperwork supporting his deals..

16.    The inescapable conclusion is that many if not most of the Defendants were suspicious of the Goldberg Scheme from the outset but were drawn in by greed. While discussing the Goldberg Scheme in September of 2008, broker/Defendant Jay Marmer told Robert Stein about another Ponzi scheme which had recently been uncovered. Robert Stein responded:

> I know there is a lot of this stuff out there. Michael and Elaine Stein got snared by one from CA. I know exactly how you feel and I do not blame you because I, too, felt the same way in the beginning. Therefore, I strongly suggest and would personally feel better if you wait and see what Tom's [Ryan] due diligence uncovers and then decide if you want to invest more, stay pat [sic] or withdraw what you have already invested. **I know it sounds like a scam and it may very well be, but I have been unable to ferret that out.**

8

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

(**Exhibit C**, emphasis added.)[4]

17.     In the same e-mail, Robert Stein told Jay Marmer:   "While I believe he [Goldberg] is straight, **we do not now have a way to protect ourselves from him just walking off with the money, but he did not blink when we raised the subject of workable controls**.  But, as both you and Tom have said, there are a lot of schemers out there."  (Emphasis added).

18.     Also in the fall of 2008, broker Tom Ryan wanted Goldberg or Robert Stein to explain "why [a] 12% quarterly return is sustainable."  (**Exhibit D**)

19.     In order to assuage the very real concerns investors and brokers raised about the Goldberg Scheme, Robert Stein and Attorney Santangelo, established those "workable controls" by structuring the AUG LLCs, and their deals with Goldberg, such that they could assure potential investors that their capital and profits would be isolated and protected from **both** Robert Stein and Goldberg (the "Cash Control Structure"). (**Exhibit E**)

20.     Through the Cash Control Structure, all the Defendants who invested in the Goldberg Scheme delivered their money directly to Attorney Santangelo's trust account (the "Santangelo Trust Account") rather than by giving it to Robert Stein or the AUG LLCs.

---

[4]     In a series of Rule 2004 examinations prior to the commencement of this case, the Trustee marked 154 exhibits, some of which are referenced herein and in the Complaint by their original numbers for ease of introduction at the prejudgment remedy hearing.  Those exhibits referenced herein are attached hereto with their original numbers.

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

21.   Pursuant to the operating agreements of both AUG LLCs, the cash in the

Santangelo Trust Account could be invested in the Goldberg Scheme and nowhere else.

This cash was further "controlled" by going from the Santangelo Trust Account to

Goldberg's attorney, Michael Clinton's, trust account (the "Clinton Trust Account"),

pursuant to an escrow agreement entered into among Goldberg, Attorney Clinton,

Attorney Santangelo's Law Firm and the AUG LLCs (the "Cash Control Escrow

Agreement"). The Cash Control Structure was designed by Robert Stein and Attorney

Santangelo to assure skeptical Investor Defendants that neither Goldberg nor Robert

Stein could access their cash and it was highlighted in the offering memorandum for the

AUG LLCs:

> The Company and Acquisitions Unlimited Group
> have agreed to a certain escrow procedure wherein
> **Investor funds will not be used nor within the
> reach of Acquisitions Unlimited Group or
> R. Stein throughout the entire investment cycle.**
> The Company, through its counsel, will apply its
> investment funds directly to Chase when
> repossessed goods are being purchased by
> Acquisitions Unlimited Group. The pre-arranged
> buyer will then agree in its contract with
> Acquisitions Unlimited Group (as a precondition to
> Company's obligation to fund the Chase purchase)
> to wire its payment to an escrow agent who will
> then divide the proceeds between the Acquisitions
> Unlimited Group and the Company.

**(Exhibit F**, emphasis added.)

10

22.    Pursuant to the Cash Control Structure, the Investor Defendants' capital was not only restricted to investments in the Goldberg Scheme, it was to be automatically re-invested with Goldberg unless no acceptable Goldberg deals were available.    On the payout of a deal with Goldberg, all the Defendants' cash went back into the Santangelo Trust Account.    Furthermore, no Investor Defendant was entitled to a return of his capital unless he or she made a written demand at least forty-five days in advance of the due date of a pending Goldberg Scheme payout.    "Profits," fees and commissions (as opposed to capital) were distributed from the Santangelo Trust Account to all the Defendants automatically after they were paid by Goldberg.

23.    Thus, through the Cash Control Structure, all the Defendants' cash was paid into and out of the Santangelo Trust Account and was never touched by the AUG LLCs or Robert Stein. In fact, neither of the AUG LLCs had a bank account or other means to hold investor funds.

24.    The Investor Defendants and the Stein Defendants invested in the Goldberg Scheme through a series of contracts referred to herein (and in the Complaint) as Contracts One through Six.    Contract One was an AUG II contract involving an initial capital investment of $3,920,000.00 by the Investor Defendants and Stein Defendants set forth on **Schedule A.** Under the terms of Contract One, Goldberg was to repay the amount invested plus a 12% profit within ninety days of the initial investment.    Of this 12% profit, 7 ½% was to go to the Investor Defendants, 2% was to go to the Broker

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

Defendants[5] (if any), and 2 ½% was to go to AUG Partners (essentially, Robert Stein and his wife and children) as manager of the AUG LLCs.

25.    Towards the end of 2008, many of the Defendants' concerns about the legitimacy of the Goldberg Scheme increased due to the arrest and subsequent publicity concerning Bernie Madoff and other Ponzi scheme operators.    For example, on December 22, 2008, Tom Ryan sent Robert Stein two e-mails concerning Madoff and the Tom Petters Ponzi scheme saying that he and other investors were "spooked".  **(Exhibit G)**

26.    Robert Stein responded to Tom Ryan with an e-mail designed to explain how the Cash Control Structure provided protection against a potential Ponzi scheme.

> Lots of shady stuff going on.  The differences are
>
> 1.  **Neither Michael or I ever touch the money**
> 2.  Money received by escrow agent is deposited into a Chase account by the escrow agent and the account is for deposits only.  No withdrawals of any kind are allowed.  EVER.  Have letter to that effect from bank.
> 3.  The customer pays the escrow agent, not Michael.
> 4.  If the customer fails to pay, the bank makes good on the principal.
> 5.  We have copies of signed contracts, purchase orders and bank documentation verifying each transaction.
> 6.  We spoke to and got letters from all principal parties.
> 7.  I had my own money invested for over two years.
> 8.  One of my investors just had $250K in principal returned due to a capital call.

---

[5]  The Investor Defendants all invested through the Broker Defendants' efforts and thus received a 7 ½% "profit".  The Stein Defendants received 9 ½% "profit" per quarter because they did not have to pay a broker's commission.

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

9. If Michael was going to run off with the money, he
would have done so before signing an escrow
agreement putting almost $4 million he totally
controlled a few weeks ago, totally and irrevocably out
of his reach.

**(Exhibit H**, emphasis added.)

27. On January 28, 2009, Goldberg transferred $3,920,000.00, plus
$470,400.00 in "profits" from Contract One to the Santangelo Trust Account. The
"profits" were then distributed to the AUG II Defendants in the amounts set forth on
**Schedule B.**

28. Notwithstanding growing concerns, the AUG II Defendants entered into
Contract Two in the end of January 2009 in reliance upon on the Cash Control Structure.
It was essentially a rollover of the investments from Contract One, but it involved
$3,725,000.00 in capital, because the Stein Defendant, Robert Stein Trust, withdrew
$195,000.00 of its capital from the previous contract. The amounts invested by each
Investor Defendant and Stein Defendant in Contract Two are set forth on **Schedule C.**
The invested capital of $3,725,000.00 for Contract Two, plus a 12% "profit" was due
from the Goldberg Scheme at the end of April, 2009.

29. Contract Three was an AUG contract, was entered into simultaneously
with Contract Two and provided for a $3,000,000.00 investment in the Goldberg Scheme
for goods purportedly to be sold to UTC. The division of UTC which was the purported
buyer was UTC's Hamilton Sunstrand division ("UTC/Hamilton"). The investment

13

capital plus a 12% "profit" was to be returned in late April, 2009. The amounts invested by each Investor Defendant and Stein Defendant in Contract Three are set forth on **Schedule D**.

30.    Contracts 2 and 3 were due on April 29, 2009 but were not paid by Goldberg until May 4th and May 7th, 2009 when Goldberg transferred the original capital, the "profit" and the fees from Contracts Two and Three directly to the Santangelo Trust Account (instead of sending it through the Clinton Escrow Account) in violation of the Cash Control Escrow Agreement. The capital for both Contracts Two and Three remained in the Santangelo Trust Account while the "profits" and fees were distributed to the Defendants as set forth on **Schedule E**.

31.    When they received these late payments on Contracts 2 and 3 in May of 2009, Robert Stein and Attorney Santangelo realized that the Cash Control Escrow Agreement had been violated because the payments had come directly from the Debtor, LLCs' bank account at Bank of America (the "Goldberg Account") and not from the Clinton Trust Account, as required. Furthermore, in April, 2009, Attorney Santangelo and Robert Stein discovered that the Chase employees who had supposedly signed and been copied on an important letter confirming the Chase Asset Protection Clause (a mere few weeks earlier) were surprisingly both no longer employed by Chase. Additionally, this letter refers to "Chase Manhattan Corporate" and uses a Chase Manhattan logo even

14

though Chase Manhattan Bank had merged with JP Morgan in 2000 and had been known for almost a decade as "JP Morgan Chase".

32.    Robert Stein and Attorney Santangelo became extremely concerned that the Cash Control Structure would not protect their and their clients' investments from the fraud they had suspected all along and they issued the following memorandum to Goldberg demanding that Goldberg agree to additional "controls" in order to receive any more investments (the "Restructure Demand Memo"):

> Memo   May 10, 2009
>
> To:  Michael S. Goldberg
>
> From:  Carl Santangelo
>
> Re:    Michael S. Goldberg, LLC, d/b/a Acquisitions Unlimited Group/AUG Partners, LLC, AUG, LLC, AUG II, LLC & AUG III, LLC
>
> I am writing this memo to be clear as to what needs to be addressed going forward in your transactions with AUG Partners, LLC and its related entities.
>
> JP Morgan Chase Matters
>
> I need to visit Chase in New York to meet with the person(s) handling your account relationship.   Further, given the fact that neither Pat Caffrey nor Kevin Danielson are employed by Chase, I will need a letter from Chase (addressed directly to AUG Partners, LLC and from the person who I will meet) acknowledging the following:
>
> 1.  That the Chase Capital Protection Clause is in full force and effect;

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

2. That the letter written by Kevin Danielson, dated March 13, 2009 is ratified;

3. That the Chase sweep account in the name of Michael S. Goldberg, LLC may not, in any circumstance, be accessed by your company; and

4. That in the event the Chase Capital Protection Clause is invoked relating to any deal in which AUG is an investor, the proceeds should be payable to my trust account for further distribution to the participants.

Contract Matters

In light of the fact that Hamilton Sunstrand and Swinerton paid your company directly and the escrow requirements of our contract were violated, Bob Stein has raised deep concerns about our current contractual structure.  Accordingly, we will need to have the contact information (name of person handling your account, address & telephone number) of each buyer of goods from your company.  We will further need to amend each pending contract whereby AUG will be acknowledged as a participant in such contract so that the buyer will be contractually bound to pay the purchase funds to the escrow agent.  The amendment will further state that the material terms of the contract may not be revised or modified without the written consent of AUG.  Future contracts will be revised to include these new terms.

**(Exhibit I)**

33.    In response to one of the demands above, Goldberg arranged a meeting with "Chase" two days later.  On May 12, 2009, Attorney Santangelo and Goldberg met at a Chase branch in New York with a woman who introduced herself as "Julia Bates," a

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

Chase official. "Julia Bates" was actually Christine Woods (the "Chase Imposter"), a friend of Goldberg's who was not, and never had been, employed by Chase.

34.     Notwithstanding the serious concerns expressed in the Restructure Demand Memo and their demand to meet with "Chase", neither Attorney Santangelo nor Robert Stein made any independent effort at that time to contact representatives of the purported Pre-Arranged Buyers, UTC, Bechtel or Swinerton.

35.     After the Chase meeting, and in order to strengthen the Cash Control Structure further, Robert Stein and Attorney Santangelo demanded that Goldberg restructure their contractual arrangements and the Cash Control Escrow Agreement, to further isolate the Defendants' cash from Goldberg.

36.     Contracts Four, Five and Six were restructured with Goldberg in May, 2009 as "Contract Participation Agreements" in which the AUG LLCs participated in the Debtor, LLC's "contracts" with the Pre-Arranged Buyers:   Swinerton, UTC and Bechtel. In an effort to control the flow of funds from the Pre-Arranged Buyers directly into the Santangelo Trust Account, these Contract Participation Agreements were buttressed by outright assignments of Goldberg's contracts with the Pre-Arranged Buyers to Attorney Santangelo as Escrow Agent (the "Contract Assignments").   Under this revised Cash Control Structure, the Pre-Arranged Buyers were supposed to pay the entire amount due under their contracts with the Debtor, LLC into the Santangelo Trust Account, including Goldberg's "cut" of the purchase price for the Chase Assets. Surprisingly, neither the

17

Contract Participation Agreements nor the Contract Assignments included any Pre-Arranged Buyer as a party or signatory and it appears that no effort was made by the Defendants to directly include them. After restructuring their arrangement with Goldberg, Contracts Four, Five and Six were funded out of the Santangelo Trust Account in May, 2009.

37.    Contract Four purported to be a contract with Swinerton in the amount of $3,725,000.00 with the principal investment of each AUG II Defendant set forth on **Schedule F**.

38.    Contract Five purported to be a contract with UTC in the amount of $3,000,000.00 with the principal amount invested by each AUG Defendant set forth on **Schedule G**.

39.    Contract Six purported to be a contract with Bechtel in the amount of $2,184,800.00 with the principal amount invested by each AUG Defendant set forth on **Schedule H**.

40.    In late May, 2009, while all of these machinations were occurring, an Investor Defendant expressed to his broker, Tom Ryan, both his and other investors' continuing concerns that the Goldberg Scheme might be a Ponzi scheme: **"everyone is still scared of the Madoff factor: if they returned (sic) for the risks are too good to be true, then they must be.'"** (**Exhibit J**, emphasis added.)

18

41.    Tom Ryan forwarded the Investor Defendants' concerns to Robert Stein, who reassured Ryan that "the best way to overcome the 'Madoff factor' is through a thorough due diligence process." **(Exhibit K)**

42.    That same day, May, 26, 2009, in response to these continuing "too good to be true" concerns expressed by existing and potential investors, Tom Ryan sent a proposed new investor solicitation letter to Robert Stein and Attorney Santangelo for their approval.  In his letter, Tom Ryan described the Cash Control Structure for investors as follows:  "in every transaction the principal and profit participation are returned the [sic] Carl Santangelo's trust account **to avoid the appearance of a Ponzi or Madoff scheme." (Exhibit L)**  Emphasis added.  Also in late May, 2009, in a separate draft solicitation letter to attract new investors, Robert Stein's son, Jeffrey Stein ( a member of the manager of the AUG, LLC's) detailed the merits of the Cash Control Structure:

> from the outset because of the tremendous ROI we offer, we were met with raised eyebrows (and more than a few references to Madoff).  **To help alleviate investor concerns and to create a completely secure investment, we have implemented a system whereby the money never goes through the hands of the intermediary.  In fact, the money never goes through our hands, either.**  Investors send money to an escrow agent to deposit the funds into a Chase account from which only Chase can make withdrawals.  The third party cusotomers [sic] pay the escrow agent who distributes the profits and principal to the individual investors.  All of the profits and principal are returned to the escrow agent before an [additional] investment is made. **There is zero opportunity for your money to be stolen by the intermediary or AUG LLC.**

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

(**Exhibit M**, emphasis added.)

43.    Although the Contract Participation Agreements and the Contract Assignments executed by Goldberg purportedly granted direct rights in the Chase Asset Sale contracts with the Pre-Arranged Buyers, Goldberg suspiciously insisted on language that restricted any contact with these companies to e-mail communications at addresses provided by Goldberg and with no direct contact by Robert Stein or Attorney Santangelo permitted.

44.    Even though they had been relying on the Cash Control Structure to protect them from the fraud they had suspected from the outset, in early July 2009, Attorney Santangelo and that Robert Stein finally began to perform the kind of due diligence on the Goldberg Scheme they could and should have performed all along.  On July 7, 2009, Attorney Santangelo determined that the e-mail addresses for the Chase Imposter, Swinerton, UTC and Bechtel that he had been given by Goldberg were all phony and had all been set-up by the same individual, Angelo Scalise, a resident of Rocky Hill, Connecticut.  Also, on July 7, 2009, Attorney Santangelo performed a reverse telephone search on the phone number on the business card he had received from the Chase Imposter in New York a few weeks earlier and determined that the telephone number for "Julia Bates" was actually the phone number of Christine Woods, a woman living in Bronx, New York.  On the same day that Attorney Santangelo discovered that

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

the e-mail addresses Goldberg had given him were fraudulent, and that "Julia Bates" was an imposter, he sent copies of the purported Contract Assignments to Swinerton, UTC/Hamilton and Bechtel, not by e-mail as required by Goldberg, but by Federal Express.

45.     One of these packages was sent to Brian Gleason at UTC/Hamilton because he was the signatory on Goldberg's contract with UTC/Hamilton and the person Goldberg had identified to Robert Stein and Attorney Santangelo as his contact. After receiving Attorney Santangelo's notice of assignment of Goldberg's UTC/Hamilton contract, **about which he knew nothing**, Brian Gleason called Attorney Santangelo on July 9, 2009, and stated: "I am not a purchasing agent with Hamilton. I do not make agreements for them."

46.     According to Brian Gleason's deposition testimony, Attorney Santangelo "just seemed very frustrated and concerned and just said, you know, so you don't make contracts for Hamilton and have not made a contract with them or with Goldberg? I said yes." As a result, by no later than July 9, 2009, Robert Stein and Attorney Santangelo knew with certainty that the Goldberg Scheme was a fraud and a Ponzi scheme.

47.     Now certain that the Goldberg Scheme was a Ponzi Scheme, in late July, 2009, Attorney Santangelo asked Goldberg to arrange another meeting for him at Chase with the Chase Imposter (who Santangelo knew to be a fake), Mr. Goldberg and a new potential investor, Attorney Santangelo's horse racing buddy, Nelson Obus. Mr. Obus is

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

a hedge fund manager for Wynnefield Capital in New York City. Attorney Santangelo arranged the meeting by telling Goldberg that Wynnefield Capital was potentially interested in investing in the Goldberg Scheme.

48.    On August 4, 2009, Mr. Obus, Attorney Santangelo, Mr. Goldberg, and the Chase Imposter met at Chase to discuss Wynnefield Capital's supposed interest in the Goldberg Scheme.

49.    Before the meeting, Attorney Santangelo informed Mr. Obus that he wanted him to evaluate the bona fides of Goldberg and the Goldberg Scheme.

50.    Shortly after the meeting, Mr. Obus informed Attorney Santangelo that he had no intention of investing in the Goldberg Scheme and that he was not sure that the Goldberg Scheme was a legitimate investment.

51.    In deposition testimony, Mr. Obus had this to say about the meeting and the returns the Defendants were getting from the Goldberg Scheme:

> Q.    And did either Mr. Santangelo or Mr. Goldberg ever tell you that he was paying, as part of the deal, a total amount of 12 percent per quarter?
> A.    Paying who?
> Q.    Paying the group – his group – the group of investors and brokers.
> A.    Oh, 12 percent a quarter?
> Q.    Yes.
> A.    That would be 50 percent annual.  That seems – I don't think those numbers were thrown my way.  I was concerned with the numbers he threw my way which were lower.

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

Q.      Right.  If you had heard the 12 percent per quarter, what would your reaction have been?

A.      I wouldn't have even gone.

Q.      And the reason you would not have gone is because?

A.      Nobody gets those returns.

52.     On August 12, 2009, a little more than a week after the meeting between Mr. Obus, Goldberg, Attorney Santangelo and the Chase Imposter, Attorney Santangelo sent an e-mail to Mr. Obus stating:

> if you are contacted by Michael Goldberg re your investment in Acquisitions Unlimited Group, I want you to know what we have told him.  We have said that we are working on a contract with your lawyers and are on track to fund the full $10M of your investment in the first week of September.  Let me know if Goldberg calls you.  **He is due to pay off our current investment contracts early next week so he may want to doublecheck that your money is coming in before he pays us.**

(**Exhibit N**, emphasis added.)

53.     On August 21, 2009 in order to lessen the financial pressure on Goldberg when paying the amounts due on their outstanding contracts, Attorney Santangelo sent letters via e-mail to each of the phony e-mail addresses pretending to tell Swinerton, UTC and Bechtel that they needed only to pay the AUG LLCs' portion of the assigned contracts and that Goldberg's "cut" could be paid directly to Goldberg.   Of course at this point, Attorney Santangelo knew he was in actuality communicating with Goldberg and not the Pre-Arranged Buyers.

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

54.    Between August 20, 2009 and September 2, 2009, Goldberg transferred a total of $9,978,976.00 into the Santangelo Trust Account, representing a capital re-payment of $5,184,800 to the AUG Defendants, a capital re-payment of $3,725,000.00 to the AUG II Defendants and "profits" and fees of $622,000.00 to the AUG Defendants and "profits" and fees of $447,000.00 to the AUG II Defendants. Attorney Santangelo immediately distributed the "profits" and fees, but did not return the Defendants' capital until September 10, 2009.

55.    The dates, amounts of capital, "profits" and fees distributed for Contracts Four, Five and Six are set forth on **Schedule I**.  The total amount distributed to each Defendant of capital, "profits" and fees and the amounts and dates of each transfer are set forth on **Schedule J.**  At the time the Investor Defendants received their return of capital from Attorney Santangelo on September, 2009.  **None** of them had demanded the withdrawal of their funds as required by the AUG LLCs Operating Agreements for a return of investor capital.

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

56.    On September 3, 2009, immediately after Attorney Santangelo received the last of the transfers from the Goldberg Account into his trust account, Robert Stein and Attorney Santangelo finally confronted Goldberg with his lies but were only willing to do so in a public place with security cameras and armed guards.  **(Exhibit O)**

James Berman, Chapter 7 Trustee
For the Estates of Michael S. Goldberg and
Michael S. Goldberg, LLC


Subscribed and sworn to before me on this 31st day of March, 2011.

Notary Public/Commissioner of the Superior Court

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

## GLOSSARY OF CERTAIN DEFINED TERMS FOR TRUSTEE'S AFFIDAVIT AND COMPLAINT AGAINST COHEN, ET AL. (ADV. PRO. 11-02013)

1.     "AUG" means AUG, LLC, a Florida limited liability company in which AUG Partners, LLC is the managing member and certain Investor Defendants are members.

2.     "AUG II" means AUG II, LLC, a Florida limited liability company in which AUG Partners, LLC is the managing member and certain Investor Defendants are members.

3.     "AUG Partners" means AUG Partners, LLC, a Florida limited liability company, the managing member of AUG and AUG II and in which Robert Stein is the managing member.

4.     "AUG Defendants" means, collectively, AUG, AUG Partners, the Broker Defendants, and those Investor Defendants and Stein Defendants who were members of AUG.

5.     "AUG II Defendants" means, collectively, AUG II, AUG Partners, the Broker Defendants, and those Investor Defendants and Stein Defendants who were members of AUG II.

6.     "AUG LLCs' Preferential Transfers" means the approximately $10 million dollars of transfers the Debtors made to the AUG Defendants and to the AUG II Defendants between August 20, 2009 and September 2, 2009, as set forth in Exhibit K to the Complaint.

7.     "AUG LLCs' Two Year Transfers" means the approximately $11.8 million dollars of transfers the Debtor made to the AUG Defendants and AUG II Defendants between January 29, 2009 and September 10, 2009, as set forth in Exhibit J to the Complaint.

8.     "AUG Partners' Defendants" mean, collectively, Robert Stein, Elaine Stein, Michael Stein and Jeffrey Stein, all of whom are members of AUG Partners.

9.     "AUG Partners' Intentional Fraudulent Transfers" mean the transfers made by AUG Partners to the AUG Partners' Defendants as set forth in Exhibit N to the Complaint.

10.     "Broker Defendants" mean, collectively, Tom Ryan, TJR, Strategem, Stuart Cohen, Jay Marmer and FSS.

11.    "Cash Control Escrow Agreement" means the escrow agreement entered into among Goldberg, Attorney Clinton, Attorney Santangelo's Law Firm and the AUG LLCs to ensure that the funds paid to Goldberg by the Pre-Arranged Buyers were isolated and controlled pursuant to the Cash Control Structure.

12.    The "Cash Control Structure" means one of the "workable controls" implemented by Robert Stein and Attorney Santangelo to protect against fraud by Goldberg and to ensure that neither Goldberg nor Robert Stein could "touch" the Defendants' cash.

13.    "Chase" means JP Morgan Chase, N.A.

14.    "Chase Asset Deals" mean the fictitious transactions where Goldberg supposedly purchased foreclosed business assets from a "Chase Foreclosure Manifest" and "flipped" them to the Pre-Arranged Buyers for enormous profit in a very short time frame.

15.    "Chase Imposter" means Christine Woods a/k/a "Julia Bates", an accomplice of Goldberg's who posed as a Chase employee.

16.    "Chase Master Agreement" means a purported 1999 contract between Goldberg and Chase, whereby Chase agreed to let Goldberg purchase the Chase foreclosed assets and included the "Contract Dissolution Capital Protection Clause" which purportedly guaranteed return of Goldberg's capital if the deals with the Pre-Arranged Buyers fell through.

17.    "Clinton Trust Account" means the attorney trust account of Michael Clinton, Esq., through which the funds from the Pre-Approved Buyers were supposed to go on their way back to the Defendants.

18.    "Contract Assignments" mean the outright assignments of Goldberg's contracts with the Pre-Arranged Buyers to Attorney Santangelo, as Escrow Agent.

19.     "Contract Dissolution Capital Protection Clause" means the clause in the fictitious Chase Master Agreement that obligated Chase to repurchase the foreclosed business assets purchased by Goldberg if he was unable to re-sell the acquired assets to the Pre-Arranged Buyers.

20.     "Debtor" or "Debtors" collectively means Goldberg and the Debtor LLC.

21.     "Debtor LLC" means Michael S. Goldberg, LLC d/b/a Acquisitions Unlimited Group.

22.     "Diamond Deals" mean the fictitious transactions in which Goldberg supposedly purchased diamonds at extremely low wholesale prices on the New York City diamond exchange and resold those diamonds for a large profit paying investors usually a 20% return on a 60-day diamond liquidation contract.

23.     "Feeders" means individuals and entities who brought investors to the Goldberg Scheme in return for a percentage of the investment dollars they generated.

24.     "FSS" means Financial Security Services, LLC, a broker who brought certain Investor Defendants to the Goldberg Scheme.

25.     "Goldberg" means Michael S. Goldberg.

26.      "Goldberg Account" means the Debtor LLCs' bank account at Bank of America through which most of the large transactions were processed with investors from the spring of 2008 forward.

27.     "Goldberg Scheme" means the Ponzi Scheme operated by the Debtors, as more fully described in the Complaint.

28.      "Investor Defendants" mean those investors who invested in the Goldberg Scheme through the AUG LLCs, and through the efforts of a broker.

3

29.    "Petition Date" means November 18, 2009.

30.    "Pre-Arranged Buyers" means the large companies that Goldberg represented to investors were buying the Chase foreclosed assets in pre-arranged deals.   They included Swinerton Incorporated, United Technologies Corporation and Bechtel Corporation.

31.    "Restructure Demand Memo" means the memorandum, dated May 10, 2009, from Carl Santangelo to Goldberg, demanding that Goldberg change the structure of his deals with the Defendants to further isolate and protect the Defendants' cash in part because Goldberg had violated the Clinton Escrow Account Agreement.

32.    "Santangelo Trust Account" means the trust account of Carl Santangelo, Esq. into which all the Defendants transferred their cash to be invested in the Goldberg Scheme and out of which all the Defendants were paid their profit, capital returns, fees and commissions.

33.    "Stein Defendants" mean Robert Stein and his family members and friends who invested in the Goldberg Scheme through the AUG LLCs.

34.    "Stein L.P." means R. Stein & Co., L.P., a limited partnership that invested in the Goldberg Scheme prior to the Defendants' investments which are the subject of the Complaint and in which Robert Stein is the General Partner and many of the Defendants are limited partners.

35.    "TJR" means Thomas J. Ryan Investment Brokers, Inc., a broker who brought certain Investor Defendants to the Goldberg Scheme.

36.    "Tom Ryan" means Thomas J. Ryan.

37.    "UTC" means United Technologies Corporation.

38.    "UTC/Hamilton" means UTC's Hamilton Sunstrand Division.

4

39.    "Strategem" means Strategem Associates, Inc., a broker who brought certain Investor Defendants to the Goldberg Scheme.