## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re | ) Chapter 7 |
| | ) |
| MICHAEL S. GOLDBERG, LLC | ) Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG | )          09-23371 (ASD) |
| | ) Jointly Administered |
| | )   Under Case No. 09-23370 |
| Debtors. | ) |
| | |
| JAMES BERMAN, CHAPTER 7 TRUSTEE | ) |
|  FOR THE ESTATES OF | ) |
| MICHAEL S. GOLDBERG, LLC, and | ) |
| MICHAEL S. GOLDBERG | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adv. Pro. No. 11-02013 |
| v. | ) |
| AUG, LLC, ET AL | ) |
| | ) |
| Defendants. | ) |

## TRUSTEE'S OMNIBUS OBJECTION TO DEFENDANTS' MOTIONS TO DISMISS[1]

## I.  BACKGROUND

In late August and early September of 2009, approximately two months prior to

the collapse of the Goldberg Scheme[2], the Debtor, LLC transferred approximately $10

---

[1]     This objection responds to the three Motions to Dismiss filed by Nancy Adelis, et. al. (the "Adelis Motion"), AUG Partners, LLC, et. al. (the "AUG Partners Motion", and Gayle Brown, et. al. (the "Brown Motion").  Because all three motions incorporate the same arguments,  the Trustee is filing one omnibus objection and respectfully requests that the Court deem this Objection filed in response to all three Motions to Dismiss.  Any issues that were not raised in all three motions are addressed at the end of this Objection.

[2]     Unless otherwise provided, capitalized terms shall have the same meaning as was ascribed in the Trustee's Complaint, dated February 11, 2011.

million dollars of fraudulently obtained money (the "Stolen Funds") into Carl Santangelo, Esq.'s trustee account (the "Santangelo Trust Account") for the benefit of all of the Defendants.[3]  The Debtor LLC transferred these funds into the Santangelo Trust Account at a time when defendant Robert Stein and Attorney Santangelo <u>knew</u> that the Goldberg Scheme was fraudulent and almost certainly <u>knew</u> it was a Ponzi Scheme.

In the months leading up to the transfer of the Stolen Funds, Robert Stein and Attorney Santangelo had gone to great lengths to ensure that these last payments would be made because they had actual knowledge that the Goldberg Scheme was fraudulent. In fact, Attorney Santangelo went so far as to orchestrate a meeting with Goldberg at JP Morgan Chase wherein Attorney Santangelo tried to convince Goldberg that if he paid the Defendants, Goldberg would be rewarded with a $10 million investment from a new investor.  Attorney Santangelo knew that the "investor" had no intention of investing with Goldberg.  After that meeting, Goldberg transferred the Stolen Funds to the Santangelo Trust Account.  Attorney Santangelo then issued trustee checks directly from his trust account to all the Defendants.  These transfers all occurred within 90 days of the Petition Date.

Attorney Santangelo received the Stolen Funds into his Trust Account as an attorney holding client funds in escrow for a specific purpose.   He had no right to or

---

[3]  Whether Goldberg knew about each individual Defendant and understood each Defendant's "interest"  in the Stolen Funds is irrelevant (<u>See</u>, Adelis Motion, n. 2).  As alleged in the Complaint,  the Defendants all knew they were investing in the Goldberg Scheme and all  of the  funds that were paid by the Debtor LLC into  Attorney Santangelo's trust account were paid into that trust account for the benefit of the Defendants and to protect the funds from theft by Robert Stein and the AUG, LLCs.

interest in those funds.  United States v. Rothstein, 2010 U.S. Dist. LEXIS 73865 *9

(S.D. Fla. 2010) (citing, In Re Rothstein, Rosenfeldt, Adler, P.A., 2010 Bankr. LEXIS

1802 (Bankr. S.D. Fla. 2010).  See also, Rules 5-1.1 (a) and 5.1.1(b) of the Rules

Regulating the Florida Bar.  His legal and ethical obligations as an attorney, and the

contractual requirements of the AUG, LLCs' operating agreements, precluded him from

doing anything with the Stolen Funds other than: (a) retaining them in his trust account

for the benefit of all the Defendants or (b) delivering the funds *directly* to all of the

Defendants. Complaint ¶ 108.  Attorney Santangelo did not have the legal or contractual

option of transferring the Stolen Funds to the AUG, LLCs nor could he have reinvested

those funds in the Goldberg Scheme, which he knew to be fraudulent.

The Defendants argue that the AUG, LLCs, entities without bank accounts and

subject to an express contractual prohibition from accessing the Defendants' cash, were

the initial transferees of these transfers, and that the Defendants were, therefore,

subsequent transferees.  See, e.g., AUG Partners Motion, pp. 3-4, Adelis Motion, pp. 5-8.

The Defendants argue that they are subsequent transferees under 11 U.S.C. § 550(a)(2),

and therefore entitled to avail themselves of the affirmative defense set forth in 11 U.S.C.

§ 550(b)(1) that they took "for value and in  good faith", simply because Attorney

Santangelo was (in their view) holding the Stolen Funds for the benefit of the AUG,

LLCs and not for the benefit of individual Defendants.

The facts, the law and the equities as articulated in the Complaint prohibit this

overly formalistic and erroneous result and mandate treating these two-step transactions

as transfers directly to the ultimate recipients.  This allows the Trustee to recover the

Stolen Funds as preferential and/or fraudulent conveyances from the Defendants, for the

benefit of all of the victims of the Goldberg Scheme, as opposed to holding worthless

claims against insolvent entities who never even touched the Stolen Funds.

## II.    STANDARD OF REVIEW

In determining a Rule 12(b)(6) motion to dismiss for failure to state a claim for

which relief can be granted, the Court must determine whether the plaintiff has pled

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face." Marcantonio v. Abbott (In Re Ronald Vance Abbott), 2009 Bankr. LEXIS 4180

*3 (Bankr. D. Conn. 2009) (citing Ashcroft v. Iqbal, 129 S. Ct 1937, 1949-50, 173 L. Ed.

2d 868 (2009)) (hereafter "Iqbal").  In evaluating the sufficiency of a cause of action, the

Court must accept as true all the allegations contained in the Complaint, other than pure

legal conclusions.  As the Supreme Court stated in Iqbal:

> In keeping with these principles a court considering a motion to
> dismiss can choose to begin by identifying pleadings that, because
> they are no more than conclusions, are not entitled to the
> assumption of truth.  While legal conclusions can provide the
> framework of a complaint, they must be supported by factual
> allegations.  When there are well-pleaded factual allegations, a
> court should assume their veracity and then determine whether
> they plausibly give rise to an entitlement to relief.

Iqbal, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d. 868 (2009).

As this Court recently noted, factual allegations give rise to a claim that is

plausible on its face as long as "the Complaint … allege[s] facts sufficient, either directly

or by reasonable inference, to support each of the required elements of the underlying cause of action". <u>Marcantonio v. Abbott</u> 2009 Bankr. LEXIS 4180 at *6-7 (emphasis added). In ruling upon a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. <u>DiFolco v. MSNBC Cable, LLC</u>, 622 F.3d 104, 110-111 (2d Cir. 2010).

## III.   <u>ARGUMENT</u>

### A.   <u>The Motions to Dismiss As To Counts 1-5 Are Ill – Conceived Because Rule 8(d) Allows The Trustee To Plead Both Initial And Subsequent Transferee Liability In The Same Counts And The Complaint Need Only Plead Either Form Of Transferee Liability Sufficiently For the Entire  Count To Survive</u>.

The Defendants argue that the Trustee has not pled sufficient facts to plausibly establish (and, in fact, has pled facts inconsistent with) the Defendants being the <u>initial transferees</u> of the Stolen Funds and, therefore, "the claims against the [Defendants] as 'initial transferees' in each of Counts I-V[sic] should be dismissed for failure to state a cause of action." <u>Adelis Motion, p. 8.</u> This alleged infirmity does not exist and, even if it did, the relief sought by the Movants is inappropriate.

The Defendants acknowledge that the Trustee has alternatively, and adequately, pled subsequent transferee liability and they acknowledge they were "text book" subsequent transferees of the Stolen Funds. <u>See</u>, <u>AUG Partners Motion</u>, pp. 3-4; <u>Adelis Motion</u>, p. 5-8. This admission is all that is necessary for Counts 1-5 to survive dismissal in their entirety. Fed. R. Civ. P. 8 (d)(2) states:

A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, *the pleading is sufficient if any one of them is sufficient.*")(emphasis added).

If claims are inconsistent, courts will nevertheless entertain both claims even if only one is adequately pled. <u>Henry v. Daytop Village</u>, 42, F.3d 89, 95-96 (2d Cir. 1994); <u>Btesh v. City of Maitland</u>, 2010 U.S. Dist. LEXIS 64447 *14 n.4 (M.D. Fla. 2010) ("Because the Court finds that actual agency is sufficiently pled, the Court need not determine whether the alleged facts plausibly establish apparent agency. *See* Fed. R. Civ. P. 8(d)(2)").

Moreover, there is no fundamental defect[4] in the Trustee's Complaint regarding allegations of initial transferee liability. The Trustee has alleged and pled a myriad of facts establishing that all of the Defendants (except the AUG, LLCs who got <u>no</u> money) were the initial transferees of the Stolen Funds and/or that they should be treated as initial transferees under various legal/equitable doctrines.

1.   **<u>The Trustee Has Adequately Pled Avoidance And Recovery As To All The Defendants And All The Transfers They Received As Initial And/Or Subsequent Transferees</u>**

In order to survive a Rule 12(b)(6) challenge, the Trustee's preference and fraudulent conveyance counts must: (1) identify the amounts and dates of the transfers of the Stolen Funds made to each defendant; (2) plead sufficient facts to avoid those

---

[4] <u>See</u> Adelis Motion, p. 6, n.2.

transfers as either preferences, intentional fraudulent conveyances or constructive fraudulent conveyances; and (3) allege that recovery by the Trustee is available against each defendant as an initial or subsequent transferee.  See, Generally, Picard v. Estate of Chais,  445 B.R. 206 (Bankr. S.D.N.Y. 2011).   This, the Trustee has certainly done.   In Counts 1-5, the Complaint describes the Goldberg Ponzi Scheme, the Defendants' investment relationship with the Goldberg Scheme and the transfers made to each of the Defendants out of the Goldberg Scheme.  The Complaint includes an explanation of why the Goldberg Scheme constituted a pure Ponzi Scheme and attaches a copy of the Goldberg Plea Agreement (Exhibit A), wherein Mr. Goldberg admits that the Goldberg Scheme was a pure Ponzi Scheme.

A majority of cases, including the more recent ones, hold that proof of a Ponzi Scheme establishes the Debtor's intent to defraud creditors with respect to all transfers made in furtherance of the fraudulent scheme.  See e.g. Wing v. Williams, 2011 U.S. Dist. LEXIS 25607 *12 (D. Utah 2011); Christian Brothers High School Endowment v. Bayou No Leverage Fund, LLC, 439 B.R. 284, 294 (S.D.N.Y. 2010); Armstrong v. Collins, 2010 U.S. Dist. LEXIS 28075 *63 (S.D.N.Y. 2010); Commodities Futures Trading Commission v. Forte,  2010 U.S. Dist. LEXIS 24705 *14 (E.D.Pa. 2010).  This "Ponzi Scheme Presumption" has even more force where, as here, the Debtor never conducted any real business underlying the Ponzi Scheme, and there was therefore no possible legitimate business justification for any of the transfers to investors.

Moreover, in determining the sufficiency of the Complaint, this Court should be mindful of the more relaxed pleading requirements imposed on a bankruptcy trustee who has no prior knowledge of the facts.  See Community Memorial Hospital v. Gordon (In Re: Gordon) 231 B.R. 459, 466 (Bankr. D. Conn., 1999) ("with regard to allegations of fraud, bankruptcy courts do not necessarily require the rigid standards demanded in a non-bankruptcy civil proceeding") (Citing Flexi-Van Leasing, Inc. v. Perez, 155 B.R. 844, 849 (Bankr. E.D.N.Y. 1993).[5]

---

[5]   See also, Picard v. Merkin, et al, 440 B.R. 243, 254 (Bankr. S.D.N.Y. 2010)

> In applying this heightened pleading requirement where applicable, this Court is mindful of the vastness and complexity of the Trustee's investigation of the Madoff Ponzi scheme, and the disadvantage the Trustee faces in pleading fraud against multiple Defendants.  It has been held that courts will take a "liberal" approach in construing allegations of actual fraud asserted by a bankruptcy trustee on behalf of all creditors of an estate). Pereira v. Grecogas Ltd., et al. (In re Saba Enters., Inc.), 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009); Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.), 310 B.R. 500, 505 (Bankr.S.D.N.Y.2002), leave to appeal denied, 288 B.R. 52 (S.D.N.Y. 2002). Courts have found that "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases, because ... it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors."  Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citing Atlanta Shipping Corp., Inc. v. Chem. Bank, 631 F.Supp. 335, 348 (S.D.N.Y. 1986), aff'd, 818 F.2d 240 (2d Cir. 1987)). Consistent with the foregoing, as the Trustee is pleading from secondhand knowledge, "allegations of circumstantial evidence are sufficient to establish fraudulent intent." In re Saba Enters., Inc., 421 B.R. at 643. Moreover, as "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time, the trustee's handicap increases," and he should therefore be afforded "even greater latitude." Stratton Oakmont, Inc., 234 B.R. at 310 (citing A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 1998 U.S. Dist. LEXIS 4175 *6 (S.D.N.Y. Apr. 1, 1998)).

As regards transferee liability, the Complaint identifies each Defendant, the transfers they made into the Santangelo Trust Account (which were then invested in the Goldberg Scheme) and the transfers received by each Defendant out of the Santangelo Trust Account (from the Goldberg Scheme), including the amounts and dates of each transfer received from, and made to, each defendant.  Complaint, ¶23-161 and Schedules A-K.[6]  The Complaint also describes the various participants in these transactions, the role each played in orchestrating the Defendants' investments in the Goldberg Scheme and the rates of return, fees, commissions or other remuneration each Defendant received for participating in these transactions.  Complaint ¶¶23-141.

Finally, the Complaint describes the increasingly tight Cash Control Structure relied upon by the Defendants to isolate and protect their investments from theft by either Goldberg, the AUG, LLCs or Robert Stein.  Complaint ¶¶ "100-109, 112-114, 117-122, and 126-132.  Thus, the Complaint describes all the transfers that constitute avoidable preferences and fraudulent conveyances to the Defendants in great detail.

---

[6]    Schedule A (Contract 1 Investments by Defendant in the Goldberg Scheme); Schedule B (Profits, Fees and Commissions from the Goldberg Scheme Distributed to each Defendant Pursuant to Contract 1); Schedule C (Contract 2 Investments by Defendant in the Goldberg Scheme); Schedule D (Contract 3 Investments by the Defendant  in the Goldberg Scheme); Schedule E (Profits, Fees and Commission from the Goldberg Scheme Distributed to each Defendant pursuant to Contracts 2 and 3); Schedule F (Contract 4 Investments by Defendant in the Goldberg Scheme); Schedule G (Contract 5 Investments by Defendant in the Goldberg Scheme); Schedule H (Contract 6 Investments by Defendant in the Goldberg Scheme), Schedule I (Profits, Fees and Commissions from the Goldberg Scheme Distributed to each Defendant on Contracts 4, 5 and 6); Schedule J (Total Capital, Profits Fees and Commissions Transferred to Each Defendant from the Goldberg Scheme Pursuant to Contracts 1-6 including the Final Distribution for the Goldberg Scheme); and Schedule K (All Transfers To Each Defendant That Constitute Avoidable Preferences).

2.      **The Trustee Has Adequately Pled Facts Establishing That The Defendants Were "Initial Transferees" Of The Preferential And Fraudulent Conveyances They Received From The Goldberg Scheme.**

Transferee liability (as opposed to fraudulent intent) need not be pled with particularity.  See e.g. Madoff v. Estate of Chais, 2011 Bankr. LEXIS 606 *64 (S.D.N.Y. 2011) ("In determining whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled, the Court need only apply a Rule 8 analysis"). Notwithstanding the relaxed pleading standards for bankruptcy trustees as opposed to more typical plaintiffs, and for recovery as opposed to avoidance, under any standard the Complaint  sufficiently pleads facts supporting the Defendants' status as initial transferees.

First, as acknowledged in the  AUG Partners, LLC Motion, Paragraph 140 of the Complaint states:

> [B]etween August 20, 2009 and September 2, 2009, Goldberg transferred a total of $9,978,976.00 into the Santangelo Trust Account, representing a capital re-payment of $5,184,800 **to the AUG Defendants**, a capital re-payment of $3,725,000.00 **to the AUG II  Defendants** and "profits" and fees of $622,000.00 **to the AUG Defendants** and "profits" and fees of $477,000.00 **to the AUG II Defendants**".

Therefore, contrary to the Motions to Dismiss, the Trustee **has** alleged in the Complaint that the approximately $10 million of Stolen Funds paid into the Santangelo

Trust Account during the preference period was paid directly to all the Defendants as initial transferees.[7] Complaint ¶¶99, 140 and Schedules J and K.

The Complaint also alleges predicate facts plausibly establishing that the Defendants were the initial transferees from the Debtor, LLC of all the transfers they received from the Santangelo Trust Account. In this regard, the Complaint alleges that:

a. Because many Defendants, including Robert Stein and his brokers, Jay Marmer, Stuart Cohen and Thomas Ryan, were suspicious of Goldberg from the start and were concerned about the incredible profits he was delivering on a consistent basis, they set-up the "Cash Control Structure" which involved a series of escrow accounts through which the Defendants' investments in Goldberg would be transferred. See, Complaint ¶¶ 98-109, 116, 117, 118, 120, 122 and 128.

b. In order to induce the Defendants to invest in the Goldberg Scheme and to protect their investments, the Defendants' money could only be invested in the Goldberg Scheme and nowhere else. Their money was protected from Goldberg, Robert Stein, and the AUG, LLCs because neither Goldberg, Robert Stein, nor the AUG, LLCs were supposed to be able to touch their money-- the Defendants' money "never went through their hands". Investors were also told by Robert Stein and his brokers that: "There is zero opportunity for your money to be stolen by the intermediary or AUG, LLC". See, Complaint ¶¶ 103, 105, 106, 107, 108, 109 and 128.

c. The Defendants' money was paid directly into the Santangelo Trust Account and then invested in the Goldberg Scheme. The Defendants capital, profits fees and commissions from the Goldberg Scheme were paid directly back to the Santangelo Trust Account and then paid out of the Santangelo Trust Account to the Defendants by trustee check in order to prevent Robert Stein or the AUG, LLCs from being able to steal or divert any of the Defendants' money. The Offering Memorandum for the AUG, LLCs states: "Investor Funds will not be used nor within the reach of Acquisition' Unlimited Group or R. Stein throughout the entire investment cycle". Finally, the AUG, LLCs had no ability to even

---

[7]   The AUG Partners, LLC Movants appear to overlook that the definitions of "AUG Defendants" and "AUG II Defendants" in paragraph 99 of the Complaint **include all the Defendants** and not just the AUG LLCs. See AUG Partners, LLC Motion, pp. 4-5.

posess the money transferred from the Goldberg Scheme because they did not own bank accounts.  <u>Complaint</u> ¶¶ 105, 106, 107, 109, 120 and 128.

Finally, it can be inferred from the Complaint that the AUG, LLCs were a sham. These were not true entities in which the Defendants were investing their money, but rather merely vehicles through which Robert Stein generated commissions as a feeder in the Goldberg Scheme.  In fact, the AUG, LLCs are the only Defendants who never received <u>any</u> actual transfers be they initial or subsequent.  Taken together, all of these factual allegations support the Trustee's ultimate allegation that the Defendants were all actual initial transferees of the Stolen Funds.

The Complaint, thus, not only alleges that the Defendants were initial transferees, Complaint ¶ 140, it also alleges precatory facts supporting that ultimate fact--and from which that fact can reasonably be inferred.  The Complaint alleges, repeatedly, that the Trustee is entitled to recover the Stolen Funds from the Defendants because transfers from the Debtor, LLC were made to each of the Defendants either <u>directly</u> as initial transferees or as initial transferees under several legal and/or equitable doctrines designed to treat the ultimate intended recipient as the initial transferee, notwithstanding layered transactions.  <u>Complaint</u> ¶¶ 151, 157, 163, 168 and 175.  At the pleading stage, such allegations would be sufficient even if Rule 8(d) did not, by itself, warrant denial of the Motions to Dismiss.[8]

---

[8]  Because the Movants acknowledge that the Trustee has sufficiently pled subsequent transferee liability as an alternate theory, there would be no basis to dismiss "portions of Counts 1-5 that seek to impose initial transferee liability on the Defendants" even if initial transferee liability had not been adequately pled.  Fed. R. Civ. P. 8(d)(2).

**3.    The Trustee's Legal/Equitable Theories (As Opposed To His Factual Allegations) That The Defendants Should Be Treated As Initial Transferees Are Not Subject To A Motion To Dismiss, And The Trustee Is Entitled To Develop Additional Facts Through Discovery To Support These Theories**

The Movants also strive mightily to get this Court to dismiss not entire <u>counts,</u> but several legal/equitable arguments the Trustee has articulated in the Complaint.  These legal/equitable arguments are the Conduit Theory, the Collapsing Doctrine, and the "for the benefit of" prong of 11 U.S.C. §550(a)(1).  The common goal of these legal/equitable doctrines is to look past the form of a transfer to its true economic substance and to achieve equity by treating the real recipient of a preferential or fraudulent transfer as the initial transferee so that Defendants do not obtain the benefit of defenses otherwise unavailable simply because the transactions were creatively layered.   The Trustee chose to include certain legal theories in the Complaint, but was not required to do so, and those legal arguments are not subject to eradication at the pleading stage when there are sufficient alternative bases to support the counts.  <u>See</u> <u>Community Memorial Hospital v. Gordon</u>, 231 B.R. at 466 ("the rule of particularity, however, 'does not require that the Complaint explain the Plaintiff's theory of the case….'") (citing, <u>Buckmasters, Ltd. v. Action Archery, Inc.</u>, 915 F. Supp. 1188, 1194 (M.D. Ala. 1966)); <u>see also</u> Fed. R. Civ. P. 8(d).

Thus, even if the Trustee's legal/equitable theories were not sufficiently supported by the factual allegations of the Complaint, they are nevertheless immune from dismissal under Rule 8(d) and the Trustee is entitled to  develop facts through discovery which

support the Conduit, Collapsing and the "for the benefit of" theories.  The Complaint is not a motion for summary judgment or a post-trial brief and the Defendants' attempt to "win" on the Trustee's legal/equitable  theories at the pleading stage is both inappropriate and, as set forth below,  contrary to the facts and the law.

**4.** **If This Court Ultimately Determines That the Defendants Were Not Actual Initial Transferees Of the Stolen Funds The Facts Pled Support Treating The Defendants As Initial Transferees Under The Alternative Legal/Equitable Doctrines Of Conduit, Collapsing And Intended Beneficiary Liability**

The Trustee's legal theories are not only immune from dismissal under Rule 8(d) because the Trustee has adequately pled both actual and initial liability and subsequent transferee liability, this Court can determine <u>now</u> that the facts alleged, if proven, support one or more of these legal/equitable theories and would render the Defendants initial transferees under 11 U.S.C. § 547, 548 and 550.

**a.** **Conduit Theory**

The Trustee has pled that because of the nature of the Santangelo Trust Account, and the contractual and other controls and restrictions on the Defendants' investments in the Goldberg Scheme, the Defendants were actual initial transferees of all of the Stolen Funds the moment such funds were transferred into the Santangelo Trust Account, in August and September of 2009.  Nevertheless, if this Court ultimately determines that the Defendants were not actual  initial transferees, the so-called Conduit Theory renders them initial transferees, liable for the preferences they received, without the benefit of the "for

value and in good faith" defense under 11 U.S.C. § 548 (c) or § 550(b)(2).  It is the possibility of being **deemed** initial transferees that the Defendants inappropriately seek to escape through the Motions to Dismiss.

The Conduit Theory is an equitable doctrine which was developed by courts to do justice in circumstances where an initial transferee should not be treated as such because he, she or it did not have sufficient "dominion and control" over the funds that passed through their hands to render them liable for recovery.  In the Second Circuit, the leading case is <u>Christy v. Alexander & Alexander of NY, Inc.</u>, 130 F. 3d 52, 57-58 (2d Cir. 1997), which adopted the "dominion and control test" first articulated in <u>Bonded Financial Services, Inc. v. European American Bank</u>, 838 F. 2d 890, 893-94 (7th Cir. 1988).

As alleged in the Complaint, because Attorney Santangelo was holding the Stolen Funds in his trustee account, <u>he</u> is not even deemed an initial transferee or conduit of the funds with any cognizable interest.   <u>In Re: Rothstein, Rosenfeldt, Adler, P.A.</u>, 2010 Bankr. LEXIS at *9-10.  The only other potential initial transferees of the Stolen Funds (besides the Defendants) are the AUG, LLCs.  The Defendants take the position that the AUG, LLCs were the true initial transferees because Attorney Santangelo was holding the Stolen Funds for the benefit of the AUG, LLCs and <u>not</u> for the benefit of the Defendants.  This argument is not consistent with the facts pled in the Complaint.  As alleged throughout the Complaint, the AUG, LLCs and Robert Stein were not allowed to have access to the Defendants' investments in the Goldberg Scheme, were never intended

to receive the funds and could not exercise dominion and control over them.  In fact, the entire Cash Control Structure, as alleged in the Complaint, was designed to alleviate the Defendants' concerns that their investments could be stolen by either Goldberg, the AUG, LLCs or Robert Stein. Complaint ¶¶ 103, 105-109, 113, 120 and 128.

Thus, as alleged in the Complaint, both Attorney Santangelo and the AUG, LLCs should be treated as mere conduits (or less) because neither could exercise dominion and control over the Stolen Funds and the Stolen Funds were always intended to be delivered to the Defendants.

The Defendants claim that Conduit Theory can be used only as a shield by an innocent initial transferee and not as a sword by the Trustee.  This argument not only undermines the equitable nature of the Conduit Theory and its common sense goal  of treating the true intended transferees as initial transferees, it is also wrong as a matter of law.  Courts have allowed the use of the Conduit Theory as a so-called "sword" by a Trustee to overcome a defendant/transferee's attempt to gain the benefits of being a subsequent transferee.   See, Pereira v. Dow Chemical Company (In re: Trace International Holdings Inc.), 287 B.R. 98, 106 (Bankr. S.D.N.Y. 2002) acq. in result, Pereira v. Dow Chemical Company, 2006 U.S. Dist. LEXIS 98262 *2 n. 1 ("The Bankruptcy Court concluded BSI was only a conduit for the transfer of funds, and treated the transaction as if it had occurred between Dow and Trace. . . .  This opinion follows the Bankruptcy Court's lead") (citation omitted).  In Pereira, Chief Bankruptcy Judge Bernstein of the Southern District of New York determined that even though Dow

Chemical argued  that it was a subsequent transferee entitled to the "for value and in good

faith" defense under 11 U.S.C. § 550(b)(2), the Conduit Theory rendered Dow an initial

transferee:

> Although Trace made the dividend payments to the escrow agent for the
> benefit of BSI, BSI never had control over the dividend payments or the
> right to use them.  Instead the Escrow Agreement directed the escrow
> agent to remit the payments to Dow on account of BSI's obligations under
> the Dow/BSI Loan Agreement.  **Consequently, Dow was the initial
> transferee of the Trace payments.**

Id. (citing, Christy v. Alexander & Alexander of New York, Inc., 130 F.3d at 59).  It

would be hard to find a case more analogous to Pereira than the instant case where the

Complaint alleges that  Attorney Santangelo received the Stolen Funds into his trust

account for the  particular purpose of paying them to the Defendants, and the AUG, LLCs

possessed no bank accounts and neither they, nor Robert Stein, were permitted to access

the Defendants' money.

### b.  **Collapsing Doctrine**


Similar to the Conduit Theory, Collapsing is an equitable doctrine, developed in

the context of leveraged buyouts that were attacked by bankruptcy trustees as intentional

and/or constructive fraudulent conveyances which rendered the Debtor insolvent, or

where the debtor encumbered itself with debt with the intention of transferring loan

proceeds to equity holders in the form of share buy-outs as an intentional fraud on its

creditors.  Under the Collapsing Doctrine, a court can collapse a series of transactions

comprising a fraudulent conveyance into a single transfer, thereby deeming the ultimate transferee the initial transferee.  Application of the Collapsing Doctrine requires that the actual initial transferee be aware of all of the facts and circumstances that render the initial transfer part of an overall fraudulent scheme.  <u>Official Committee of Unsecured Creditors of M. Fabrikant and Sons, Inc. v. JP Morgan Chase Bank, N.A., et al</u>, 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008) ("Second, the initial transferee must have actual or constructive knowledge of the entire scheme that renders the exchange with the debtor fraudulent").  As alleged in the Complaint, not only were Robert Stein (and therefore the AUG, LLCs he managed) and Attorney Santangelo on inquiry notice of the fraudulent nature of the Goldberg Scheme, they actually knew it was a fraudulent enterprise and a Ponzi Scheme before the Stolen Funds were received into the Santangelo Trust Account.  Under the Collapsing doctrine, the facts articulated in the Complaint would render the Defendants the true initial transferees of the Stolen Funds as opposed to allowing the inequitable fiction of the AUG, LLCs being treated as the initial transferees.  Even under the <u>Adelis</u> Movants' erroneous reading of <u>Fabrikant</u> that the transferee from whom recovery is sought (as opposed to the initial transferee) needs to posses the guilty knowledge for collapsing to apply, the Complaint alleges sufficient facts establishing that Robert Stein and Attorney Santangelo's knowledge is imputable to the Defendants.  <u>Complaint</u> pp. 2-5, ¶¶ 98-142.

**c.** **"For The Benefit of" Liability Under 11 U.S.C. § 550(b)(1)**

Finally, this Court can deem the Defendants strictly liable for the return of the Stolen Funds as avoidable preferences because the Defendants were "the entities for whose benefit the transfers were made" under 11 U.S.C. § 550(a)(1).  The Defendants argue that this prong of the statute cannot be applicable to defendants who actually received the preferential or fraudulent transfers and was only intended to apply to guarantors and other parties who never actually received the funds.  Lowry v. Sec. Pac. Bus. Credit, 892 F. 2d 26, 29 (4th Cir. 1989).  Lowry is not binding on this Court.  Moreover, while the Seventh and Ninth Circuit follow Lowry, the First Circuit does not.  Max Sugarman Funeral Home v. A.D.B. Investors, 926 F. 2d 1248, 1256 (1st Cir. 1991).  Given the split among circuits on the issue, and the sufficiency of Counts 1-5 under Rule 8(d), the Trustee is entitled to advocate, either in a motion for summary judgment or at trial, that the "for the benefit of" doctrine can and should apply under these circumstances to actual recipients of the transfers..  See id.

**B.** **Connecticut Law Governs The Uniform Fraudulent Transfer Counts 4 And 5**

In determining the choice of law, a bankruptcy court must apply the choice of law rules of the forum state, in this case, Connecticut.  Bianco v. Erkins, 243 F. 3d 599, 605-08 (2d Cir. 2001).  Fraudulent transfer claims are tort claims, Tom v. Ratizeden, 413 B.R. 609, 621 (Bankr. S.D. Tex 2008).  Accordingly, the Court should apply Connecticut's choice of law rules for torts claims in choosing which state's law to apply to the state law

fraudulent transfer claims (Counts Four and Five)[9].  In choosing which law to apply to tort claims, Connecticut applies the law of the place of the injury except where this approach yields an "arbitrary, irrational result."  O'Connor v. O'Connor, 201 Conn. 632, 650, 519 A.2d 13, 22 (1986); Abdullah v. Pfizer, Inc., 562 F.3d 163, 190 (2d. Cir. 2009).  "Recently, courts applying Connecticut choice of law have used the most significant relationship approach, even where applying the law of the place of the injury would lead to the same result."  Wells Fargo v. Konover, et al, 2011 U.S. Dist. LEXIS 32079 *43 (D. Conn. 2011).   Here, the relevant transfers were made by the Debtor, LLC (a Connecticut LLC) at Goldberg's direction (a Connecticut resident).  The transactions originated from a Connecticut bank.  Thus, the injury (the fraudulent transfer from the Debtor, LLC) occurred in Connecticut.

In evaluating the most significant relationship, courts look at:

(1) The place of the injury;

(2) The place where the conduct causing the injury occurred;

(3) The domicile, residence, place of incorporation and place of business of the parties; and

(4) The place where the business relationship between the parties is centered.

Id. (citing Restatement (Second) Conflict of Laws § 145(2)).  Here, the transfers originated in Connecticut, from a Connecticut LLC based in Connecticut resulting from

---

[9]  Some Courts have treated fraudulent transfer claims as contract claims for choice of law purposes.  Connecticut applies the "most significant relationship" approach to choice of law issues for contract claims.  Am. States. Ins. Co. v. Allstate Ins. Co., 282 Conn. 454, 461-62, 922 A. 2d. 1043 (2007).

an elaborate Ponzi scheme orchestrated in Connecticut.  Moreover, the Defendants were investing a Connecticut based venture.  Florida's only connection to the transfers is that the Santangelo Trust Account was located in Florida.  Connecticut clearly has the most significant relationship to the fraudulent transfers described in Counts Four and Five. Accordingly, Connecticut law should apply.

### C.   The Trustee Has Decided To Voluntarily Dismiss Counts Six and Seven

The Movants have moved to dismiss Counts Six and Seven claiming that the Trustee lacks standing to pursue the illegal distribution claims on behalf of the AUG, LLCs.  The Movants claim that AUG, LLC and AUG II, LLC are the only proper plaintiffs for these counts pursuant to Fla. Stat. §608.626 and Fla. Stat. §608.628.  While the Trustee disagrees with Movants' statutory interpretation, See Colborne Corp. v. Weinstein, 2010 Colo. App. LEXIS 58 (3d Div. 2010) cert. granted 2010 Colo. LEXIS 606 (2010), the Trustee has determined to pursue these claims through an alternative avenue so as to avoid unnecessary delay of this proceeding.

### D.   The Trustee Has Decided To Voluntarily Dismiss The Unjust Enrichment Claim Count Ten

The Movants have moved to dismiss Count Ten.  The Trustee has reevaluated the cause of action of unjust enrichment in light of the doctrine of *in pari delicto*[10] (which was not raised by the Movants), and has determined not to pursue this claim in his capacity as Trustee.

---

[10]  Hirsch v. Arthur Andersen, 72 F.3d 1085, 1094 (2d Cir. 1995)

**E.**  **The Court Should Deny The Movants' Motion To Strike The Trustee's Request For Injunctive Relief**

The Movants have asked this Court to strike the Trustee's request for attorney's fees and for injunctive relief.  While the Trustee concedes that attorney's fees are not available pursuant to the Connecticut Uniform Transfer Act (CUFTA), <u>Derderian v. Derderian</u>, 3 Conn. App. 522, 529, 490 A.2d 1008 (1985) cert. den'd  196 Conn 810, 495 A. 2d 279 (1985),  CUFTA specifically provides for injunctive relief, where appropriate. Conn. Gen. Stat. §52-552h(a) (3).   Therefore, the Trustee withdraws his request for attorneys fees but maintains his demand for injunctive relief.

## IV.   <u>CONCLUSION</u>

For all foregoing reasons, particularly in light of Fed. R. Civ. P. (8)(d)(2), the Movants' motions to dismiss should be denied.

Dated at Bridgeport, Connecticut this 13th day of May, 2011.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE ESTATES OF
MICHAEL S. GOLDBERG AND
MICHAEL S. GOLDBERG, LLC


By____/s/ Jed Horwitt_____
Jed Horwitt (ct04778)
Jeffrey Hellman (ct04102)
Lawrence S. Grossman (ct15790)
ZEISLER & ZEISLER, P.C.
558 Clinton Avenue
Bridgeport, Connecticut 06605
(203) 368-4234
(203) 367-9678 (fax)
jhorwitt@zeislaw.com